Evelyn SNYDER

v.

Linda HAAGEN.

Supreme Judicial Court of Maine.

Submitted on Briefs Feb. 16, 1996.
Decided June 14, 1996.

Joseph L. Ferris, Ferris, Dearborn & Willey, Brewer, for Plaintiff.

Lewellyn R. Michaud, Bangor, for Defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

LIPEZ, Justice.

Evelyn Pawliger Snyder appeals from the judgment entered in the Superior Court (Penobscot County, *MacInnes, A.R.J.*), fixing the location of the boundaries of her parcel and two parcels owned by Linda Haagen. Snyder contends that the court erred in its interpretation of the controlling deed. Haagen contends that there was competent evidence in the record to support the court's conclusions. We affirm the judgment.

Haagen owns property in Orrington on Field's Pond that abuts the disputed northern and western boundaries of Snyder's property. Snyder purchased the two parcels that make up her total interest in 1983.[1] Haagen purchased the parcel that abuts Snyder's western boundary in 1984. In 1987, Haagen acquired the parcel that abuts Snyder's northern boundary (*see* attachment for a depiction of the boundaries and properties at issue).

Over the years, a dispute has arisen between the two neighbors as to the location of the western and northern boundaries of Snyder's lot. In 1992 Snyder commenced this action seeking a declaration of title, declaration of the boundaries of the parties' properties, trespass damages, a permanent injunction against future trespasses, and costs. Haagen counterclaimed seeking similar relief.

The Snyder deed describes her property as follows:

> Beginning at a point on the northerly shore of said Field's Pond at the *southwest corner of a lot of land* now or formerly *owned or occupied by Richard J. Crawford;* thence northerly on and by the westerly side line of land of said Richard J. Crawford one hundred (100) feet to a point; thence westerly at *right angles* sev-

---

1. For ease of reference throughout this opinion, the two parcels that make up the Snyder interest will be referred to as if they were one parcel.

enty-five (75) feet to a point; thence at *right angles* southerly and parallel to said westerly side line of land of said Crawford one hundred (100) feet to a point on the northerly shore of said Field's Pond; thence easterly on and by said northerly shore of said Pond seventy-five (75) feet to the point begun at.

Beginning at a point in the northeast corner of a parcel of land now or formerly owned by John E. Constantine; thence northerly on and by the westerly side line of land now or formerly owned by Richard J. Crawford one hundred (100) feet to a point; thence at *right angles* westerly seventy-five (75) feet to a point; thence at *right angles* southerly and parallel to the westerly side line of land of said Crawford one hundred (100) feet to a point in the northwest corner of said parcel of land now or formerly owned by said Constantine; thence at *right angles* easterly on and by the northerly line of land of said Constantine seventy-five (75) feet to the point begun at.

(emphasis added). Since the parcels described are adjoined, the two conveyances create one contiguous parcel bordered by Field's Pond.

The Snyder and Haagen lots were originally a part of the Schiro/Rochelle lot, the senior lot in the general area along Field's Pond. The Schiro/Rochelle lot is two lots to the east of the Snyder lot. In between the Snyder lot and the Schiro/Rochelle lot is the Crawford/Goodness lot. The Crawford/Goodness lot is described as follows:

Beginning at a point on the northerly shore of said Field's Pond at the southwest corner of a lot of land now owned or occupied by Sidney Schiro; thence northerly on and by the westerly side line of land of said Schiro one hundred feet to a point; thence westerly at right angles one hundred feet to a point; thence at right angles southerly and parallel to said westerly side line of land of said Schiro one hundred feet to a point on the northerly shore of said Field's Pond; thence easterly on and by said northerly shore of said

Pond one hundred feet to the point begun at.

The reservation that created the Schiro/Rochelle lot is described thus:

Beginning at a pile of stones on the shore of Fields Pond about 510 feet from land of M.J. Curran; thence running northerly towards the said road 200 feet; thence westerly parallel with said road 150 feet, thence southerly parallel with the first described line 200 feet more or less *to the Pond*, thence easterly following the shore of the pond to the point of beginning . . . .

(emphasis added).

At the bench trial, Norris Staples, a surveyor qualified as an expert, testified on behalf of Snyder that he had surveyed the perimeter of the Snyder lot and that, in his professional opinion, the term "right angles" was not a call for an exact ninety degree angle, but rather a call for a right angle more or less. He also testified that, in his opinion, the phrase "to a point on the northerly shore of the pond" meant to the normal high water mark of Field's Pond. Finally, he testified that the phrase "to the Pond" (as used in the Schiro/Rochelle reservation) generally means to the low water mark.

Michael Schaffer, another surveyor qualified as an expert, testified on behalf of Haagen that the phrase "to the Pond" in the Schiro/Rochelle reservation meant that the lot thus described was bounded by the low water mark of Field's Pond. He also testified that Field's Pond has been regulated by a dam owned by Eastern Fine Paper Inc. and its predecessors since 1917.[2] He further testified that, in his professional opinion, the term "right angles" means a "right angle," which is a ninety degree angle. Finally, Schaffer testified that the Snyder lot was bounded by the mean low water mark of Field's Pond.

After a bench trial, the court adopted the description of Snyder's lot prepared by Schaffer for Haagen. This description was consistent with Schaffer's testimony that the phrase "right angles" means a ninety degree angle, as well as his testimony that the Sny-

---

2. This fact was confirmed by the testimony of an    employee of Eastern Fine Paper.

der lot is bounded by the mean low water mark of Field's Pond.

### The meaning of the phrase "right angles"

■ What the boundaries are, as ascertained from the deed, is a question of law. *Conary v. Perkins,* 464 A.2d 972, 975 (Me. 1983). Where boundaries are on the face of the earth is a question of fact. *Id.* A trial court's factual finding concerning the location of a boundary will not be disturbed on appeal unless it is clearly erroneous. *Rhoda v. Fitzpatrick,* 655 A.2d 357, 360 (Me.1995). The court's determination that the phrase "right angles" as used in the Snyder deed means a ninety degree right angle was a legal determination, *see Hodgdon v. Campbell,* 411 A.2d 667, 672 (Me.1980) (holding that referee's determination of the meaning of the word "parallel" was a legal determination), and is subject to de novo review. *Estate of Hardy,* 609 A.2d 1162, 1163 (Me.1992).

There is no Maine case in which the phrase "right angles" has been interpreted. A search of the leading treatises did not disclose any helpful caselaw from other jurisdictions. A dictionary in common use defines a right angle as: "[a]n angle formed by the perpendicular intersection of two straight lines; an angle of 90 degrees." AMERICAN HERITAGE DICTIONARY 1063 (2d ed. 1982). That definition supports the trial court's conclusion that the phrase "right angles" means a ninety degree angle.

### The third and fourth calls
### of the Snyder deed

■ When interpreting a deed, a court should first look for the controlling intent of the parties on the face of the deed. *Taylor v. Hanson,* 541 A.2d 155, 157 (Me.1988). The intent of the parties may not be clear from the face of a deed, however, if the deed contains a latent ambiguity. *Id.* A latent ambiguity occurs when, "in applying the description to the ground, the facts extrinsic to the document controvert or in some way render unclear the deed's apparently unambiguous terms." *Id.* at 158.

■ Snyder contends that her deed contains a latent ambiguity, noting that the westerly border of her parcel cannot be 200 feet as set forth in the fourth call in her deed if one applies the third and fourth calls for "right angles" as ninety degree angles. Pursuant to that application, the length of the westerly border of her parcel is only 169.54' from the northwest tip of her parcel to the mean low water mark (and only 147.24' if measured to the rebar set by Staples at the normal high water mark).

■ When a latent ambiguity exists a court may consider extrinsic evidence, including the circumstances existing at the time of the making of the deed or the contemporaneous construction of the deed by the grantee or grantor. *Tyler v. Fickett,* 73 Me. 410, 416 (1882). *See also Hanson,* 541 A.2d at 157. In the instant case, however, Snyder did not present any such extrinsic evidence.

■ In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds, such as the familiar rule that boundaries are established in descending order of control by monuments, courses, distances and quantity. *Conary,* 464 A.2d at 975. Without specific evidence that the parties intended otherwise, and when the results are not absurd or manifestly inconsistent with the parties' intentions apparent from the face of the deed, the standard rules of construction will control. *Hanson,* 541 A.2d at 158 (citing *Kinney v. Central Maine Power Co.,* 403 A.2d 346, 350 (Me.1979)).

Snyder argues that the court's ninety degree angle interpretation of "right angles," and its determination that the course controls the distance calls in her deed, leads to the absurd result that she has thirty to forty feet less than the 200 feet of length specified in the deed for her westerly boundary. By itself, however, the loss of length on one boundary is not an absurd result that is manifestly inconsistent with the parties' intentions as reflected in the provisions of Snyder's deed. *Compare, Proctor v. Hinkley,* 462 A.2d 465, 472 (Me.1983) (holding that a call to go "east" means "in an easterly direction," where going due east would result in the absurdity of grantees losing most or

all of their lake frontage).[3] The court did not err in finding as it did.

### The low water mark as a monument

■ The first call of the Snyder deed refers to the westerly boundary of the Crawford/Goodness lot: "[b]eginning at a point on the northerly shore of said Field's Pond at the southwest corner of a lot of land now or formerly owned or occupied by Richard J. Crawford...." When a deed describes the land conveyed by reference to an adjoining tract, the boundary line of the adjoining tract referred to becomes a monument to which courses, distances and quantity must yield. *Hodgdon,* 411 A.2d at 671. The southwest corner of the Crawford/Goodness lot is a monument vis-a-vis the Snyder deed.

■ The location of that corner must be understood in order to understand the phrase in the fourth call of the Snyder deed, "to a point on the northerly shore of said Pond...." The general rule is that title to land bordered by great ponds[4] extends to the seasonal normal and natural low water line at the time of the original conveyance. Hermansen & Richards, *Maine Principles of Ownership Along Water Bodies,* 47 Me. L.Rev. 35, 40 (1995) [hereinafter Hermansen & Richards, *Ownership Along Water Bodies* ]. Although the word "shore," when

properly used, refers to the land between the ordinary low stage and high stage of tidal water, the word "shore" is equivalent to the term "bank" when used in conveyances of property that border fresh water. *See Hinkley,* 462 A.2d at 473 n. 6. The term "bank" refers to the sloped edge of a body of water, and it may or may not include the low water mark. *Id.* In interpreting a deed that uses the word "bank" or, as here, the word "shore," it is necessary to determine whether the deed conveys to the low[5] or high[6] water mark.

■ "To" is a word of exclusion. *Snow v. Mount Desert Island Real Estate Co.,* 84 Me. 14, 15, 24 A. 429 (1891). *See also* Hermansen & Richards, *Ownership Along Water Bodies,* 47 Me.L.Rev. at 53. Thus a line running "to" an object excludes that object. *Snow,* 84 Me. at 15. The phrase in the Snyder deed "to a point on the northerly shore ..." thus calls by its terms for a terminus at the high water mark of Field's Pond, excluding the shore. The court found in this case, however, that the beginning point of the first call of the Snyder deed is the low water mark.[7] As explained above, the beginning point of the Snyder deed is defined according to the southwest corner of the adjoining Crawford/Goodness lot, a monument. The fourth call "to a point on the

3. Snyder also argues that the absurd result in this case is underscored when one considers that application of the meaning of "right angles" adopted by the trial court (a ninety degree angle) would, if applied to the terms of *Haagen's* deed, result in a shrinkage of approximately thirty percent of the total area of the lot Haagen acquired in 1984. It is unclear from Snyder's brief how she arrives at this conclusion. Therefore, this contention cannot be factored into the analysis.

4. A great pond is a body of standing water with a surface area of ten acres or more. *Flood v. Earle,* 145 Me. 24, 28, 71 A.2d 55, 57 (1950). *See also* 38 M.R.S.A. §§ 436–A(7) & 480–B(5) (1989).

5. Low water is the level the water recedes to during the summer months. Hermansen & Richards, *Maine Principles of Ownership Along Water Bodies,* 47 Me.L.Rev. 35, 51 (1995) [hereinafter Hermansen & Richards, *Ownership Along Water Bodies* ].

6. Normal high water is the edge of the permanent vegetation. Hermansen & Richards, *Ownership Along Water Bodies,* 47 Me.L.Rev. at 50.

7. The court made this determination by referring back to the fourth call in the reservation contained in the senior deed in the area, the Schiro/Rochelle deed, which says, "to the Pond." Such language conveys property to the point of the low water mark. Because that language was a monument with respect to the Crawford/Goodness lot (which says, "beginning at a point on the northerly shore of said Field's Pond at the southwest corner of a lot of land now owned or occupied by Sidney Schiro"), the court determined that the Crawford/Goodness lot was also bounded by the low water mark of Field's Pond. In turn the court reasoned that the southwest corner of the Crawford/Goodness lot referred to in the first call of the Snyder deed begins at the low water mark. Although the court's decision does not set forth its reasoning on this issue, the preceding analysis was before the court, and it appears to be the only way the court could have arrived at its decision.

northerly shore" also refers to a monument. Hermansen & Richards, *Ownership Along Water Bodies,* 47 Me.L.Rev. at 48. Thus the court had to reconcile inconsistent monuments at opposite corners of the Snyder property, *i.e.,* one designating the high water mark and one designating the low water mark.

We have previously held that, in the absence of some evidence that the grantor intended to separate the upland from the land between the high water mark and low water mark, inconsistent monuments which place the *termini* of one boundary at the low water mark and the *termini* of another boundary at the high water mark, will be reconciled in favor of including the land to the low water mark. *Dunton v. Parker,* 97 Me. 461, 469, 54 A. 1115 (1903). This is the result even when the call connecting the two termini, when read alone, appears to exclude that land. *Id.* *See also Whitmore v. Brown,* 100 Me. 410, 414, 61 A. 985 (1905) (holding that the call "to the shore and then by the shore," unqualified, excludes the shore, but when one or both termini of that call are at the low water

mark, it includes the land to the low water mark). This rule reflects the presumption that a grantor of water's edge property usually intends to convey land down to the low water mark. *Dunton,* 97 Me. at 469, 54 A. 1115; *Snow,* 84 Me. at 17, 24 A. 429.

In the instant case, the fourth and fifth calls of the Snyder deed read, "to a point on the northerly shore ...; thence easterly on and by said northerly shore of said Pond ... to the point begun at." According to *Dunton,* the call "*to* a point on the northerly shore ... thence easterly *on and by* said northerly shore" can fairly be read as a phrase of exclusion. Nevertheless, according to *Dunton,* the fact that the termini of the fifth call (and the beginning point of the first call) is at the low water mark justifies the court's interpretation that the Snyder parcel is bounded by the low water mark. The court's decision was not clearly erroneous.[8]

The entry is:

Judgment affirmed.

All concurring.

---

8. For the same reasons, the court's subsidiary decision (*see* note 7) interpreting the Schiro/Rochelle reservation was correct, i.e., its decision that the southeast corner of that parcel (a monument with respect to the Crawford/Goodness lot) ended at the low water mark, even though there was language in that reservation indicating that the beginning point in the first call was at or above the high water mark ("[b]eginning at a pile of stones on the shore of Fields [sic] Pond ...").