2000 ME 188

**Raymond McGEECHAN et al.**

v.

**Mary H. SHERWOOD et al.**

Supreme Judicial Court of Maine.

Argued Jan. 6, 2000.

Decided Oct. 30, 2000.

an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein."

Brett D. Baber, Esq., (orally), Baber & Weeks, P.A., Bangor, for plaintiffs.

Kevin M. Cuddy, Esq., (orally), Pamela D. Chute, Esq., Cuddy & Lanahm, Bangor, for defendants.

Panel: WATHEN, C.J., and CLIFFORD, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Mary H. Sherwood appeals from a judgment entered in the Superior Court (Penobscot County, *Mead, J.*) that declares the boundary between two properties located in Hampden, one parcel owned by Sherwood, the other by Raymond and Carolyn McGeechan. Sherwood contends that the trial court improperly decided for the McGeechans on declaratory judgment and quiet title claims by (1) failing to properly apply the standard rules of construction for the location of the boundary lines, and (2) incorrectly concluding that the McGeechans owned the area of land known as the Paper Mill Road. Sherwood also contends that the court erred in finding that the McGeechans' parcel is benefitted by an easement over Sherwood's property. In a cross-appeal, the McGeechans contend that the trial court (*Marden, J.*) erred in granting a summary judgment in favor of Sherwood and co-defendant Bangor Real Estate on their claim of intentional interference with an economic relationship arising out of Sherwood's purchase of part of her land from the Ellis family.

[¶ 2] We agree with the McGeechans that the trial court properly identified and declared the point at which the east-west boundary between the two properties begins, and we affirm the court's location of the east-west boundary line that runs from the "point of beginning" to the northern terminus of the boundary between the two properties. We also affirm the trial court's conclusion that the McGeechans' land is benefitted by an easement across what is identified as the Old Grist Mill Road and the Paper Mill Road.[1] We agree with Sherwood, however, that the court erroneously concluded (1) that the Paper Mill Road, which lies along the parties' shared north-south boundary, is in the McGeechans' chain of title,[2] and (2) that Sherwood's title does not include the Paper Mill Road.

[¶ 3] On the McGeechans' cross-appeal, we vacate the summary judgment entered against the McGeechans on their claim of

---

1. The court concluded that a survey prepared by Michael Avery, a licensed professional surveyor, depicted the boundary lines of the properties.

2. The trial court also concluded that the McGeechans were prescriptive owners of the entire Paper Mill Road. We affirm only that part of the court's determination recognizing the McGeechans' title by prescription to the section of the Paper Mill Road that encompasses their driveway.

intentional interference with an economic relationship because there exist genuine issues of material fact that must be resolved by a factfinder.

## I. BACKGROUND

[¶ 4] In the 1800s, a road formed the entire southern and western boundary of what is now the Sherwood parcel, located north and east of property owned by the McGeechans.[3] The road was single and continuous, but was identified by different names, most commonly the Old Grist Mill Road and the Paper Mill Road.[4]

[¶ 5] The parties have established the location of the segment of the road as it runs west along the southern boundary of the Sherwood parcel, forming the parties' shared north-south boundary, frequently referred to in this litigation as the Paper Mill Road. There is disagreement, however, as to who owns that segment of the old roadway, both parties claiming that the Paper Mill Road is in their chain of title.[5]

[¶ 6] The parties also agree on the northern terminus of the road. They disagree, however, as to where that road turns from the southern boundary of the Sherwood parcel and heads north, that point being the disputed "point of beginning" located by the trial court. They also disagree on the precise path the road, generally referred to as the Old Grist Mill Road, travels as it runs northerly from the point of beginning to reach the agreed upon northern terminus. That line represents their shared east-west boundary.

[¶ 7] Finally, although the parties agree that Sherwood retains title to the part of the road known as the Old Grist Mill Road, which runs along the parties' shared east-west boundary, the McGeechans also claim the benefit of an easement in that road. The McGeechans alternatively assert, in the event they are not determined to be the owners of the Paper Mill Road, that their property benefits from a deed easement in the Paper Mill Road. With this general background in mind, we now turn to the events which gave rise to this appeal.

[¶ 8] The McGeechans purchased a twenty-five-acre parcel of land in Hampden in 1981. In July of 1995, they learned that an adjacent four acre parcel was being sold by the Ellis family and that David Caliendo of Bangor Real Estate was the listing agent. They contacted Caliendo and informed him of their interest in the property.

[¶ 9] Raymond McGeechan obtained a seller's disclosure for the Ellis property from Sherwood, a real estate broker with Bangor Real Estate, and Sherwood listed McGeechan on the prospect sheet for the property,[6] Sherwood did not inform McGeechan that she, too, was interested in the property. Sherwood informed Caliendo of her interest in the property and arranged to view the property at the same time as the McGeechans. Neither Caliendo nor Sherwood disclosed to the McGeechans that Sherwood was a potential purchaser.

---

3. Prior to purchasing the Ellis parcel, Sherwood had obtained two parcels south of and one adjacent to the Ellis parcel. Those three parcels abut the McGeechans' property and comprise what we refer to as "the Sherwood parcel."

4. There is some confusion as to the name of the road. Because both the parties and the trial court have done so, we generally refer to that part of the road that forms the parties' shared north-south boundary as the Paper Mill Road, and that part of the road that forms the parties' shared east-west boundary as the Old Grist Mill Road.

5. The McGeechans also claim that they have acquired title to the Paper Mill Road by adverse possession.

6. The issue of whether Sherwood's purchase of the parcel gives rise to a cause of action was decided against the McGeechans on a motion for summary judgment. Accordingly, although Sherwood disputes many of these facts, the facts of the purchase are set out in a light most favorable to the McGeechans. *See Estate of Althenn v. Althenn,* 609 A.2d 711, 714 (Me.1992).

[¶ 10] The McGeechans allege that Sherwood remained within hearing distance while they viewed the property. After touring the property, Raymond McGeechan asked Caliendo if there were any other offers on the property and Caliendo responded in the negative. McGeechan openly discussed with Caliendo the terms of their proposed offer of $30,000, and Caliendo stated that he thought the offer would be acceptable to the seller. McGeechan also informed Caliendo that the offer was intended to start a dialogue to negotiate with the Ellis family regarding the terms of the purchase. The McGeechans submitted a signed offer that Sherwood also signed as a witness.[7]

[¶ 11] One day after the McGeechans signed their offer, Sherwood prepared her own offer of $35,000. Caliendo did not inform the McGeechans of Sherwood's offer, nor did Caliendo inform Mr. Ellis that the McGeechans were prepared to pay more than $30,000 for the property. Caliendo submitted the $30,000 McGeechan offer and the $35,000 Sherwood offer to Ellis, and Ellis accepted Sherwood's offer.

[¶ 12] Subsequent to Sherwood's purchase of the Ellis property, a survey of the property conducted for Sherwood by Richard Day, a licensed professional land surveyor, concluded that the McGeechans' driveway and utility pole encroached on the Sherwood parcel. Sherwood sent a letter to the McGeechans informing them of the encroachments and giving them permission to continue to use the property for those purposes only.

[¶ 13] Believing that the driveway and utility pole were on their own property, the McGeechans hired Michael Avery, also a licensed professional land surveyor,

to survey their property. Avery concluded that the McGeechans owned their driveway and the utility pole. He also concluded that Day's survey had inaccurately located the western boundary of the Sherwood parcel and had ignored the fact that title to that part of the road identified as the Paper Mill Road was held by the McGeechans.[8]

[¶ 14] The McGeechans filed a complaint in the Superior Court for a declaratory judgment to define the boundary between the two properties. The complaint included a claim for trespass[9] and to quiet title to the property. The McGeechans also alleged that Sherwood and co-defendant Bangor Real Estate intentionally interfered with the McGeechans' economic advantage and relationship with the Ellis family in their attempt to purchase the Ellis property.

[¶ 15] Following discovery, Sherwood moved for a partial summary judgment, arguing that the McGeechans could not establish an intentional interference with an economic relationship absent some evidence of fraud, and there was no fraud. The Superior Court (*Marden, J.*) concluded that the McGeechans had failed to present sufficient evidence to show interference with an economic relationship because, as a matter of law, the alleged conduct of Sherwood and Caliendo did not rise to the level of "active concealment" that is required to prove fraud. Accordingly, the court entered a summary judgment in favor of Sherwood on that claim, which is the subject of the McGeechans' cross-appeal.

[¶ 16] A bench trial was held in December of 1998 to resolve the boundary and

7. The McGeechans do not claim that Sherwood learned of the amount of their offer by reading it from the offer sheet. Rather, they contend that Sherwood remained within hearing distance while the McGeechans were on the Ellis property, including when the McGeechans made their offer, and that "[i]t may be reasonably inferred that Mrs. Sherwood overheard Mr. McGeechan when he

told Mr. Caliendo that he was making an offer of $30,000 for the Ellis property."

8. The utility pole and part of the McGeechans' driveway are located on the Paper Mill Road.

9. The trespass claim does not appear to have been pursued.

title claims. In February of 1999, the Superior Court (*Mead, J.*) concluded that "Plaintiffs' Exhibit D, the Avery Survey, more appropriately establishes the location of the common boundary," and incorporated the survey into its judgment. The Avery survey identifies the entire boundary between the parcels and shows the McGeechans as the owners of the Paper Mill Road, which runs along the southern boundary of the Sherwood parcel. The court also agreed with Avery that the McGeechan property benefits from an easement along the Old Grist Mill Road, which runs along the western boundary of the Sherwood parcel. Sherwood appealed the judgment.

## II. THE BOUNDARY DISPUTE

### A. THE SHARED EAST–WEST BOUNDARY

[¶ 17] The property at issue in this case was originally part of two lots, designated in the early 1800s as Lots 24 and 25. Both Lot 24 and Lot 25 were roughly rectangular in shape and the boundary between them ran east-west in a straight line. Lot 24 is now owned by the McGeechans and is located directly to the south of Lot 25.

[¶ 18]. In the early 1800s, John Crosby Sr. owned all of Lot 25. In 1820, he divided that parcel using a road to mark the boundary between the two properties. That road is the same road the parties are seeking to locate in this dispute. The road begins at the southeasterly corner of Lot 25 and runs westerly along the boundary of Lots 24 and 25. At some point the road leaves that boundary and runs northerly, dividing Lot 25 into an eastern and western parcel. The Sherwood property lies within the eastern portion of Lot 25, and the McGeechans own much of the western portion of Lot 25, as well as Lot 24.

[¶ 19] Most of the physical characteristics of the road have since disappeared.

The parties and their surveyors have agreed on the location of the historic boundary between Lot 24 and 25 and have located the road along that boundary, now generally known as the Paper Mill Road. They have been unable to agree, however, on the location of the point at which the road (now generally known as the Old Grist Mill Road) leaves the boundary of Lots 24 and 25 and turns to the north dividing Lot 25. This point has been referred to in the litigation as "the point of beginning" and is essential to the location of the parties' shared east-west boundary.

[¶ 20] Also part of the title history is the fact that the eastern portion of Lot 25 was later subdivided, creating several smaller parcels. Those parcels, including most recently the Ellis parcel, were later reunited and now comprise the Sherwood parcel.

[¶ 21] The parties rely on two deeds in Sherwood's chain of title to establish the east-west boundary between their properties. The parties agree that an 1822 deed from William Gray to Benjamin Crosby describes their shared east-west boundary.[10] That deed reads, in part:

> Beginning at the north east corner of the Brick store owned by John Crosby Jr. on the southerly side of the road leading to the Old Grist Mill, thence by the southerly side of said road till it strikes said Grist Mill Pond.

[¶ 22] The "road leading to the Old Grist Mill" is the same road that begins at the northeasterly corner of Lot 24 and the southeasterly corner of Lot 25, runs along the shared north-south boundary of those lots, and ultimately turns to the north, dividing Lot 25 into an eastern and a western part.[11] Because the McGeechans now own Lot 24 and the western part of Lot 25, and Sherwood owns the eastern part of Lot 25, the "southerly side" of the "road leading to the Old Grist Mill" as described in the 1822 deed is a monument

---

**10.** William Gray obtained title to the property from John Crosby Sr.

**11.** At the time of the conveyance, it appears that no portion of the road was yet known as the Paper Mill Road.

that defines not only the north-south boundary between the parties' properties but also their common east-west boundary.

[¶ 23] The court could not locate the monument described in the 1822 deed, the "southerly side of the road leading to the Old Grist Mill," however, and relied on the description in the later 1875 deed to locate the part of the road that forms the parties' east-west boundary. After obtaining title to the eastern part of Lot 25 in 1822, Benjamin Crosby made several convey-ances, two of which are now part of the Sherwood parcel. After his death, the trustees under Benjamin's will conveyed to Barker Emery what remained of the east-ern part of Lot 25, which later became the Ellis parcel, and is now the western most of the three parcels comprising the entire Sherwood parcel. That 1875 deed de-scribes the east-west boundary by refer-ence to the same road as the 1822 deed, and the court determined the location of the parties' east-west boundary by locating the point of beginning described in the 1875 deed and connecting that point by means of a sweeping arc to the agreed on northern terminus of the parties' bound-ary.[12]

[¶ 24] The "[d]etermination of property boundaries as ascertained from a deed is a question of law." *Baptist Youth Camp v. Robinson,* 1998 ME 175, ¶ 7, 714 A.2d 809, 812. "If the language of the deed is ambiguous, and the intention of the parties is in doubt, the court may then resort to rules of construction and may examine the deed in light of extrinsic cir-cumstances surrounding its execution." *First Hartford Corp. v. Kennebec Water Dist.,* 490 A.2d 1209, 1211 (Me.1985). The rules of construction must be applied here,

at least to the extent that they "are not absurd or manifestly inconsistent with the parties' intentions apparent from the face of the deed...." *Snyder v. Haagen,* 679 A.2d 510, 513 (Me.1996). The rules of construction require a court to establish boundaries "in descending order of control by monuments, courses, distances and quantity." *Id.*

[¶ 25] The location of monuments on the face of the earth is an issue of fact, and "the trial court's findings as to such locations will not be disturbed on appeal unless they are clearly erroneous." *Har-borview Condo. Ass'n v. Pinard,* 603 A.2d 872, 873 (Me.1992). "The physical disap-pearance of a monument does not end its use in defining a boundary if its former location can be ascertained." *Theriault v. Murray,* 588 A.2d 720, 722 (Me.1991) The trial court "has a duty to determine, if possible, the original location[ ] ..." of the monument. *Id.*

[¶ 26] The initial call in the 1875 deed refers to several monuments that can be used to locate the point of beginning. The deed refers to the intersection of "the southerly side of the Paper Mill road" and "the land of the heirs of Major Crosby." [13] The deed also locates the point of begin-ning along the southerly side of the Paper Mill Road 1074 5/10 feet west of the General Crosby old brick store.

[¶ 27] The trial court found that the physical characteristics of the road had disappeared, and the evidence was insuffi-cient to indicate where the road intersect-ed with the "land of the heirs of Major Crosby," and concluded that that monu-ment could not be located.

---

12. The 1875 deed reads, in part:
   One parcel beginning on the southerly side of the Paper Mill road 1074 5/10 feet westerly from the Genl. Crosby old brick store at the land of the heirs of Major Crosby .... [de-scription of the northern boundary.] [T]hence southerly by ... the heirs of Hodg-man to Hodgman southwest corner and the old Grist Mill road. Thence by the north line of the old Grist Mill road to the Paper Mill road. Thence across said Grist Mill road to the southerly line thereof and land of J.R. Holt [Lot 24]. Thence westerly by said Holt land to the point begun at.

13. The "land of the heirs of Major Crosby" refers to the western portion of Lot 25, now owned by the McGeechans.

[¶ 28] The McGeechans introduced extensive evidence, including several deeds and historical photographs, to establish the location of the old brick store, leading the court to find that they had proven its location "with some precision." We find no clear error in that factual finding. *See Harmon v. Emerson*, 425 A.2d 978, 982 (Me.1981).

[¶ 29] Even after locating the brick store, however, the court was unable to locate the point of beginning using monuments alone. Accordingly, the court adopted the Avery survey conclusion that gave effect to the distance and course call of "1074 ⁵⁄₁₀ feet westerly from the Genl. Crosby old brick store" to locate the point of beginning referred to in the 1875 deed. That point is located along the historic boundary line of Lot 24 and Lot 25. Using this point of beginning, the court also adopted the approach taken in the Avery survey and established the western boundary of the Sherwood parcel by connecting the point of beginning and the agreed upon northern terminus using a sweeping arc.

[¶ 30] Sherwood contends that the court erred in its location of the point of beginning. She contends that the intersection of the "southerly side of the Paper Mill Road" and "the land of the heirs of Major Crosby" is the true point of beginning, and is a monument that she has located through her surveyor. Her evidence consists of prior surveys of her properties and abutting parcels, as well as historical maps and physical evidence, such as wheel tracks in the area. Sherwood also claims to have found other evidence indicating the presence of the roadway, including a stone wall, and barbed wire fencing.[14]

[¶ 31] The McGeechans, however, offered evidence that Raymond McGeechan cut trees in the area and was responsible for the wheel tracks found where Sherwood claims there was physical evidence of a road bed. Moreover, their surveyor, Michael Avery, testified that he could find no physical evidence of the road. Such evidence casts doubt on Sherwood's location of that part of the road, and the trial court was not compelled to accept Sherwood's point of beginning location.

[¶ 32] Because the trial court's determination of the point of beginning reflects a proper application of the rules of construction, giving effect in descending order to located monuments, the distance call, and finally the course call, we affirm that determination as well as the line connecting it to the agreed on northern terminus of the boundary between the two properties to establish the east-west boundary.

## B. OWNERSHIP OF THE PAPER MILL ROAD

[¶ 33] In the 1822 deed, the road is described only as "the road to the Old Grist Mill." It is clear that at that time, the road was fully contained within Lot 25. The eastern portion of Lot 25 was subsequently subdivided.

[¶ 34] Three of the parcels created by that division, including the Ellis parcel, now comprise the Sherwood parcel and border the McGeechans' property. The two parcels lying to the east of the Ellis parcel were conveyed by Benjamin Crosby during his lifetime, and those conveyances did *not* include ownership of the part of the Paper Mill Road that runs along their respective southern boundaries. Until his death, Benjamin Crosby remained the owner of (1) that part of Lot 25 that was later owned by Ellis, (2) the Old Grist Mill Road that runs along the western border of the Ellis parcel to where the road is

---

14. Sherwood argues that the point of beginning described by the distance call "1074 ⁵⁄₁₀ feet westerly from the Genl. Crosby old brick store" is not coincident with the point of beginning described by the intersection of the "southerly side of the Paper Mill road" and the "land of the heirs of Major Crosby." She contends that the court erred in finding that both calls describe the same point. We are unpersuaded by her contentions, and conclude that the trial court did not err in determining that there was only a single point of beginning described in the 1875 deed.

now identified as the Paper Mill Road, and (3) all of the Paper Mill Road that runs along the north-south border of Lots 24 and 25. By the 1875 deed, the Estate of Benjamin Crosby conveyed the Ellis parcel to Barker Emery. The trial court found that the conveyance did not include title to the Paper Mill Road. The court further found that the McGeechans own the Paper Mill Road.

[¶ 35] Because both parties claim title to the Paper Mill Road, they each bear the burden of establishing title to the parcel. *See McGrath v. Hills,* 662 A.2d 215, 217 (Me.1995).

### 1. SHERWOOD'S CLAIM OF OWNERSHIP BY DEED

[¶ 36] Sherwood's claim of title to the Paper Mill Road is based on the conveyance of what became the property of Ellis, bought from Ellis by Sherwood, described in the 1875 deed from the Estate of Benjamin Crosby to Barker Emery. We review for clear error the court's determination that the boundaries described in the 1875 deed do not include the Paper Mill Road. *See Coombs v. Grindle,* 1998 ME 230, ¶ 7, 718 A.2d 1107, 1108. In construing a deed, we seek to give effect to the intent of the parties to the deed. *St. Pierre v.. Grondin,* 513 A.2d 1368, 1370 (Me.1986). "To ascertain that intention, we take the instrument as a whole, and apply the positive rules of deed construction." *Kinney v. Cent. Me. Power Co.,* 403 A.2d 346, 349 (Me.1979). The rules of construction require that "every call in the description of the premises in the deed must be answered," *Herrick v. Hopkins,* 23 Me. 217, 219 (1843), unless absurd results are achieved thereby. *Kinney,* 403 A.2d at 350. When a deed contains competing calls, all ambiguities are resolved " 'against the grantor and *in favor of the*

*grantee.' "* *St. Pierre,* 513 A.2d at 1370 (quoting *Kinney v. Central Me. Power Co.,* 403 A.2d at 350).

[¶ 37] Further, in reviewing the deed, reliance is placed not only on the language of the deed, but also on "the inferences which may properly be drawn from stipulated or undisputed facts...." *Kinney,* 403 A.2d at 350. Our review of the record leads us to conclude that the conveyance described in the 1875 deed to Sherwood's predecessor in title includes the Paper Mill Road.

[¶ 38] The boundary description in the deed begins with the disputed point of beginning on the "southerly side of the Paper Mill road" 1074 5/10 feet from the General Crosby old brick store, a point that the trial court properly located. From that point, the boundary runs north, then east, and then:

> southerly by ... the heirs of Hodgman to Hodgman south-west corner and the old Grist Mill road. Thence by the north line of the old Grist Mill road to the Paper Mill road. Thence across said Grist Mill road to the southerly line thereof and land of J.R. Holt. Thence westerly by said Holt land to the point begun at.[15]

[¶ 39] The trial court correctly determined from the 1875 deed the location of the point of beginning, but whether the description in that deed includes the Paper Mill Road involves a different analysis.

[¶ 40] In concluding that the 1875 conveyance did not include the Paper Mill Road, the trial court disregarded the final call in the 1875 deed that describes the southerly boundary of the parcel as running "westerly by said Holt land to the point begun at." [16]

---

**15.** Holt was the owner of Lot 24 now owned by the McGeechans.

**16.** Because the Paper Mill Road runs along the entire north-south boundary of Lots 24 and 25, giving effect to the final call would

give Sherwood title to at least part of the Paper Mill Road, because it establishes the northerly line of Lot 24 (now owned by the McGeechans) and the southerly line of the road as the boundary of the land conveyed.

[¶ 41] The trial court adopted the Avery plan that depicts the boundary of the 1875 conveyance as crossing what is referred to as the Grist Mill Road from its northerly to its southerly side directly to the point of beginning, excluding from the conveyance, and thus from Sherwood's ownership, the entire portion of the Paper Mill Road that the Avery survey depicts as lying east of the point of beginning.

[¶ 42] Such a reading construes the deed *against the grantee*, disregards the deed's final call, and is inconsistent with what the other evidence shows to be the apparent intent of the grantor.

[¶ 43] Not only is there nothing in the record to indicate that the grantor would have intended the final call in the 1875 deed to have no meaning, there are strong indications that it would have been the intent of Benjamin Crosby's estate to convey title to the Paper Mill Road in that 1875 deed.

[¶ 44] The parcel conveyed by the 1875 deed would be landlocked without access to the road, yet the deed makes no reference to reserving any easement across the road, leading to an inference that the grantor intended to convey the road along with the parcel. That conclusion finds further support in the fact that Benjamin Crosby, who owned the parcel until his death, had conveyed the two adjacent parcels and had explicitly *excluded* the road from those conveyances. At the time of Benjamin Crosby's death, the land conveyed by the 1875 deed was the only parcel along the entire road that he still owned. It would make little sense for his estate to convey the parcel without also conveying title to, or at least an easement to use, the Paper Mill Road. Accordingly, the likely intent of the grantor of the 1875 deed would be to include the Paper Mill Road in the conveyance.

[¶ 45] The construction given to the deed by the trial court ignores that likely intent and disregards the final call. There is, however, a plausible reading of the description that is consistent with that intent,

and that gives meaning to the final call in the deed. That reading takes into account that over the years the roadways in the area have been known by a number of different names.

[¶ 46] The single, continuous roadway that divides what are now the Sherwood and McGeechan properties was originally known as the Old Grist Mill Road. Over time, portions of the road were referred to in deeds and records by different names: the Mill Road, the Paper Mill Road, and the Town Road. There is another road with a similar name that borders the Sherwood parcel and intersects with the road with the differing names. That other road, referred to in an 1834 deed as "a new road," had become known as the Little Paper Mill Road by 1864, and is depicted on the Avery survey as "The Little Paper Mill Road." The Little Paper Mill Road runs north and south, and intersects with what is now referred to as the Paper Mill Road, at the southeast corner of the Sherwood parcel.

[¶ 47] Recognizing that the natural intent of the grantor would be to convey the *entire* strip of road that ran along what has now become the parties' shared boundary, the most plausible reading of the last reference in the deed to the Paper Mill Road, where the line runs by the north line of the Old Grist Mill Road and crosses from the north to the south side of the Old Grist Mill Road, is that the reference was intended to be to the *Little* Paper Mill Road. *See St. Pierre*, 513 A.2d at 1370. In other words, the true intent of the grantor is reflected in the deed being read as follows:

> One parcel beginning on the southerly side of the Paper Mill Road 1074 ⁵⁄₁₀ feet westerly from the Genl. Crosby old brick store at the land of the heirs of Major Crosby .... [Description of the northern boundary]. [T]hence southerly ... by the heirs of Hodgman to Hodgman southwest corner and the old Grist Mill road. Thence by the north line of

the old Grist Mill road to the [Little] Paper Mill road. Thence across said Grist Mill road to the southerly line thereof and land of J.R. Holt. Thence westerly by said Holt land to the point begun at.

[¶ 48] Such a reading of the deed resolves the ambiguity in the deed in favor of the grantee, in this case Sherwood's predecessor in title, gives effect to each call in the deed, and effectuates what the evidence strongly suggests to be the intent of the grantor. That reading gives Sherwood title to the Paper Mill Road, the strip of road that runs along the parties' north-south boundary.

[¶ 49] Although we realize that no construction of this deed fully resolves all ambiguities, this result comports with the requirements at law that ambiguities be construed in favor of the grantee and best reflects what the evidence indicates to be the intent of the grantor and harmonizes all the calls in the deed.

## 2. THE MCGEECHAN CLAIM OF OWNERSHIP BY DEED

[¶ 50] The McGeechans contend that their title to the Paper Mill Road derives from a deed or deeds in their chain of title. Although the deeds in the McGeechans' chain of title contain language that could be read as conveying ownership of the Paper Mill Road, they point to no deed that expressly conveys *into* their chain of title ownership of any part of the Paper Mill Road. Lacking such evidence, the McGeechans cannot rely on "extrinsic surrounding circumstances ... to prove conveyance of something not expressly included in [a] deed." *Cushing v. State*, 434 A.2d 486, 497 (Me.1981). The McGeechans failed in their burden of proving ownership by deed to that part of the road.

## 3. THE MCGEECHANS' CLAIM OF TITLE BY ADVERSE POSSESSION

[¶ 51] The McGeechans also contend, and the court agreed, that they established title in the Paper Mill Road by adverse possession. In order to establish title by adverse possession, the McGeechans had to present evidence that they possessed the land for a twenty year period, and that the possession was "actual, open, visible, notorious, hostile, under a claim of right, continuous, and exclusive." *Dowley v. Morency*, 1999 ME 137, ¶ 19, 737 A.2d 1061, 1068 (footnote omitted). Whether the McGeechans' "acts of dominion" were sufficient to create title by adverse possession is a question of law. *See id.*

[¶ 52] To support their claim for adverse possession of the Paper Mill Road, the McGeechans offered evidence that they (1) used their driveway, which runs across part of the Paper Mill Road to the McGeechans' property; (2) they plowed and graded in the driveway area; (3) they installed a culvert; and (4) their predecessor in title granted to Bangor Hydroelectric Company an easement to place a utility pole. The court found that the McGeechans had sufficiently established title by adverse possession to the *entire* Paper Mill Road.

[¶ 53] Although the direct evidence presented by the McGeechans went to their use of the driveway area since the time they purchased the land in 1981, the court could properly infer that the driveway was in existence when the property was owned by the Chiaparas family, from whom the McGeechans purchased, for a sufficient period of time to reach the requisite time period. *See Blackmer v. Williams*, 437 A.2d 858, 861 (Me.1981). Accordingly, we affirm the trial court's conclusion that the McGeechans have acquired title by adverse possession to a portion of the Paper Mill Road, i.e. the driveway, to which most of the evidence was directed.

[¶ 54] The driveway, however, is only a small part of the Paper Mill Road. Except for the utility pole placed by Bangor Hydro Electric, there is scant evidence of the use of the *entire* Paper Mill Road by

the McGeechans or by anyone else. The trial court's finding that the McGeechans have proven title by adverse possession to the entire Paper Mill Road lacks support in the evidence. *See Dowley*, 1999 ME 137, ¶ 20, 737 A.2d at 1068 (allowing title by adverse possession to limited area of driveway and parking area used without granting title to entire area). Accordingly, the court's judgment must be amended to reflect that the McGeechans have acquired title by adverse possession only to the area of the Paper Mill Road over which they have maintained a driveway.

[¶ 55] Accordingly, we vacate that portion of the judgment that declares ownership of the entire Paper Mill Road in the McGeechans. We remand to the Superior Court for a declaration that the area on the Avery survey referred to as the Paper Mill Road a/k/a Town Road is owned by Sherwood, except that portion of the Paper Mill Road in the driveway area, which portion, by reason of adverse possession, is owned by the McGeechans.

## III. THE DISPUTED EASEMENTS

[¶ 56] The trial court found that the McGeechan property is benefitted by an easement over the Old Grist Mill Road and the Paper Mill Road. Deeds in the McGeechans' chain of title refer to an easement running across the Paper Mill Road as well as the Old Grist Mill Road. The absence of any deed in the record granting the McGeechans an express easement to use either road does not prevent a finding that an easement was created either by implication or estoppel. *See Frederick v. Consol. Waste Servs., Inc.*, 573 A.2d 387, 389 (Me.1990). The McGeechans have offered no evidence of an easement by estoppel, but the trial court found an easement by implication benefitting the McGeechans.

[¶ 57] "An easement over conveyed property, although not expressly reserved, may nevertheless be impliedly created in favor of the grantor of the servient estate." *LeMay v. Anderson*, 397 A.2d

984, 987 (Me.1979). There are two types of implied easements. "An easement may also be impliedly created without a preexisting use when access to the property conveyed requires trespass." *Id.* at 988, n. 3. An implied easement may also arise when, at the time of conveyance, "existing use is made of the servient portion to benefit the dominant portion. . . ." *Id.* Such use is termed a quasi-easement. Where a quasi-easement exists, an easement over the servient estate will be implied when, at the time the dominant and servient portions of the property are severed, "it is reasonable to infer that the parties to the conveyance had regarded the continuation of the use as so obvious that it would go without saying." *Bowers v. Andrews*, 557 A.2d 606, 609 (Me.1989); *LeMay*, 397 A.2d at 987. Relevant to this inquiry is the nature of the use of the quasi-easement prior to severance from the dominant estate and whether the continued use of the quasi-easement is "important for the enjoyment" of the retained parcel. *Bowers*, 557 A.2d at 609 (quoting 3 POWELL ON REAL PROPERTY ¶ 411(2) (1985 & Supp.1988)); *LeMay*, 397 A.2d at 988.

[¶ 58] In the early 1800s, John Crosby owned all of Lot 25. In 1820, he divided that parcel, retaining the western portion for himself. At trial, Michael Avery testified that the western parcel of Lot 25 could be accessed only by the Paper Mill and Old Grist Mill Roads and the trial court found that the western parcel of Lot 25 was landlocked without such access. Because the use of the road to access the western portion of Lot 25 was apparent and open at the time of conveyances, and because that parcel was carved out of the larger parcel containing all of Lot 25, the trial court's finding that the western parcel of Lot 25 was landlocked supports its determination that the parcel is benefitted by an easement reserved by implication. That easement, although not expressly contained in the original deed, has appeared in all subsequent deeds conveying the western parcel of Lot 25, and Sher-

wood has offered no evidence to indicate that the easement has been terminated. Accordingly, the court's conclusion that the western parcel of Lot 25, currently owned by the McGeechans, is benefitted by an easement over the Old Grist Mill Road and the Paper Mill Road as those roads appear on the Avery survey adopted by the trial court is not clearly erroneous.

## IV. TORTIOUS INTERFERENCE WITH AN ECONOMIC RELATIONSHIP

[¶ 59] The McGeechans' cross-appeal from a summary judgment entered against them on their claim for tortious interference with an economic relationship. When we review a summary judgment, we "view the evidence in the light most favorable to the party against whom the judgment has been granted, and review the trial court's decision for error of law." *Estate of Althenn*, 609 A.2d at 714. If the evidence favoring the nonmoving party is " 'merely colorable, or is not significantly probative, summary judgment' " may be appropriate. *Bouchard v. Am. Orthodontics*, 661 A.2d 1143, 1145 (Me.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[¶ 60] In order to demonstrate tortious interference with an economic relationship, the claimant must show either intimidation or fraud.[17] *Petit*, 688 A.2d at 430. If the claim is based on fraud, the claimant must also show that the claimant justifiably relied upon a false representation. *Id.*

[¶ 61] When a plaintiff, as here, "alleges a failure to disclose rising to the level of a misrepresentation, the plaintiff must prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative

duty to disclose." *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me.1995).

[¶ 62] " 'Active concealment of the truth' connotes steps taken by a defendant to hide the true state of affairs from the plaintiff." *Kezer v. Mark Stimson Assocs.*, 1999 ME 184, ¶ 24, 742 A.2d 898, 905 (quoting *Fitzgerald*, 658 A.2d at 1069). In *Fitzgerald*, the plaintiff sought to recover for fraud based on the claim that the seller of certain property had induced the plaintiff to buy the property by concealing the fact that a well on the property had been contaminated and was unsafe. *Fitzgerald*, 658 A.2d at 1068. Upholding the judgment in favor of the plaintiffs, we concluded there was sufficient evidence to allow a finding of active concealment. *Id.* at 1069. Those factual elements included: "(1) [a failure to] disclose; (2) the material fact that the well had been abandoned due to contamination; (3) with knowledge of the non-disclosure; [and] (4) for the purpose of inducing [the plaintiff] to purchase the farm." *Id.* Ultimately, we also concluded that the evidence supported a finding that the plaintiff had justifiably relied on the failure to disclose, and suffered damage as a consequence. *Id.*

[¶ 63] Taking the facts alleged in a light most favorable to the McGeechans, Sherwood was present as the property was being shown to the McGeechans. She allowed herself to be identified to the McGeechans as another broker, rather than as a potential purchaser, and she witnessed the McGeechans' signatures on their offer. Sherwood was present within hearing distance of Mr. McGeechan, and her offer for the property came shortly after she was in a position to overhear the McGeechan offer. There is a genuine issue of fact as to whether she was present and failed to identify herself as a potential buyer in order to induce the McGeechans to verbally discuss the offer they would make. In addition, the McGeechans have generated a factual issue as to whether

---

17. To recover for tortious interference with an economic relationship, a plaintiff must establish fraud or intimidation by a preponder-

ance of the evidence. *Petit v. Key Bank of Me.*, 688 A.2d 427, 430 (Me.1996). The McGeechans make no claim of intimidation.

Sherwood knew that her status as a potential buyer might have materially affected the decision of the McGeechans to discuss their offer in a place where she could overhear it. Finally, it may reasonably be inferred that Caliendo failed to disclose the true reason for Sherwood's presence in order to aid her attempt to purchase the property, and that the McGeechans justifiably relied on Caliendo's representation to them that Sherwood was present merely as a broker to openly discuss, to their detriment, their offer with Caliendo in the presence of Sherwood.

[¶ 64] Both Bangor Real Estate, the seller's broker, and Sherwood, as an employee of Bangor Real Estate, were subject to a statutory duty to treat the McGeechans honestly. Although the duty of a seller's real estate agent is generally to the seller, 32 M.R.S.A. § 13273(1) (1999), the seller's agent also has a duty to "treat all prospective buyers honestly and ... not knowingly give false information [to the buyer]," 32 M.R.S.A. § 13273(2)(A) (1999). From the evidence presented by the McGeechans, there is a genuine issue of fact as to whether the defendants have breached this statutory duty. Accordingly, the court erred in granting a summary judgment on the McGeechans' claim for tortious interference, and we vacate that part of the judgment.

The entry is:

That part of the judgment involving Counts I and III declaring the common east-west boundary between the properties of the plaintiffs and defendant, and that the plaintiffs' property is benefitted by an easement over the Old Grist Mill Road and the Paper Mill Road, as those roads appear on the land survey adopted by the court, and that plaintiffs, by virtue of adverse possession, own that part of the Paper Mill Road in the area of their driveway is affirmed. Judgment on Counts I and III is vacated in all other respects. Summary judgment as to Count IV is vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.

ALEXANDER, J., concurring and dissenting.

[¶ 65] I concur in all of the Court's carefully considered opinion except that part which reverses the trial court's determination that the Sherwood deed and title history does not include the Paper Mill Road. From that portion of the Court's opinion, I respectfully dissent.

[¶ 66] Citing *McGrath v. Hills*, 662 A.2d 215, 217 (Me.1995), the Court recognizes that the party claiming title, on this issue Sherwood, bears the burden of establishing title. ¶ 35. Determining the proper owner of the Paper Mill Road is a mixed question of law and fact—construing the deed, a question of law, then locating the land described by the Court's construction on the face of the earth, a question of fact. *See Eaton v. Town of Wells*, 2000 ME 176, ¶ 19, 760 A.2d 232. In this case particularly, deed construction is effected by how one resolves conflicting views about the facts regarding the shared east-west boundary.

[¶ 67] While the Court's statement of the issues makes the questions for decision seem relatively clear, the case presented to the trial court was anything but clear. The court was given a great volume of confusing and conflicting evidence. From this record, the Court developed a generally reasonable result, including its finding that Sherwood had failed to establish title to the Paper Mill Road. The trial court having found against Sherwood, who had the burden of proof, the result can only be reversed if the record compels the conclusion that Sherwood has title. *See Hughes Bros., Inc. v. A & M Contractors*, 1999 ME 175, ¶ 2, 740 A.2d 996, 997. This confused and conflicted record does not compel such a conclusion. Accordingly, I would not disturb the trial court's determination on this point.