2011 ME 108

**Frank CONNOLLY et al.**

v.

**MAINE CENTRAL RAILROAD CO.**

Supreme Judicial Court of Maine.

Argued: April 12, 2011.
Decided: Nov. 8, 2011.

William N. Palmer, Esq. (orally), Gray & Palmer, Bangor, for appellants Frank Connolly and Kathryn McCatherin.

Glen L. Porter, Esq., and Ryan P. Dumais, Esq. (orally), Eaton Peabody, Bangor, for appellee Maine Central Railroad Company.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1]   In this appeal, we consider whether use of an implied quasi-easement, historically used as a farm crossing, may be expanded to permit residential access and the installation of utility lines.  This issue arises from a judgment of the Superior Court (Penobscot County, *Studstrup, J.*) that found that an implied quasi-easement exists over the land of Maine Central Railroad Company, but concluded that its use is limited to its historical use as a farm crossing.  Frank Connolly and Kathryn McCatherin, who wish to use the easement for residential purposes, appeal from the judgment, arguing that the court erred in limiting the scope of the easement to a farm crossing.  Because we conclude that there was no factual or legal error in the court's determination of the scope of the implied quasi-easement, we affirm the judgment.

## I.  BACKGROUND

[¶ 2]   The facts are not disputed.  Sylvester Hewes was the former owner of a parcel of land bordering Hermon Pond in Hermon.  By an 1850 deed, Hewes conveyed to the Penobscot & Kennebec Railroad Company, the predecessor of Maine Central Railroad Company, a strip of land measuring six rods wide by about forty-eight rods long, on which a railroad track was later constructed.  The strip of land bisected Hewes's property, leaving approximately two and one-half acres bordering the pond to the south of the track and the remainder of the property to the north of the track.  Although the only way to access the southern two and one-half acres by land was to pass over the strip of land conveyed to the Railroad, the deed did not reserve to Hewes the right to cross the conveyed strip of land.

[¶ 3]   In 1998, Connolly and McCatherin purchased the parcel of land bisected by the railroad track.  After deciding to build a home on the southern portion of the property near the pond, they sought a wire permit from Maine Central to install utility lines across the railroad track.  Maine Central denied their request.  In response, Connolly and McCatherin brought a declaratory judgment action, requesting that the court declare a "permanent free, open and unobstructed perpet-

ual right-of-way appurtenant to [their] property ... over the property of [Maine Central]." They later moved for summary judgment, which the court (*Murphy, J.*) granted.

[¶ 4]   Maine Central appealed from the court's judgment, and we vacated the summary judgment. *Connolly v. Me. Cent. R.R. Co.*, 2009 ME 43, 969 A.2d 919. We concluded that Hewes's intent to retain an easement over the property conveyed to Maine Central was not conclusively established in the summary judgment record, and we remanded the case for a trial. *Id.* ¶ 9. The court (*Studstrup, J.*) held a jury-waived trial in June 2010, in which it found the following facts, which are supported by record evidence.

[¶ 5]   The landscape of the parcel of land currently owned by Connolly and McCatherin suggests that, at the time of the original conveyance, Hewes used his property for farming.   If Hewes had not been able to cross the Railroad's strip of land, it would have been, as the court found, "virtually impossible for him to continue to farm the southern portion of his property."   Hewes did not reserve in his deed to the Railroad an easement over the conveyed strip of land, and the earliest documentary evidence of a crossing over the tracks is a 1916 Maine Central map entitled "Right–of–Way and Track Map," which identifies a strip of land connecting the northern and southern portions of the parcel as a "farm crossing."

[¶ 6]   A witness, who was born in 1929 and whose family previously owned the lot now owned by Connolly and McCatherin, recalled from her earliest memories that there was a crossing over the railroad tracks on her family's property.   The witness and her family crossed the tracks to swim, row, and skate, among other recreational activities, and to cut hay for use on their dairy farm.   The family never developed the southern portion of the parcel.

[¶ 7]   Maine Central has known of the railroad crossing since as early as 1916 and has acquiesced in its existence.   Maine Central's track crews have assisted Connolly and McCatherin in improving the crossing and have marked the crossing to alert passing plow trains to raise their blades.   Roger Bergeron, an officer of Maine Central, testified that the railroad would have *greater liability and responsibility if the use of the easement were changed from a farm crossing to a residential crossing.*

[¶ 8]   The court determined that Connolly and McCatherin had an implied quasi-easement over Maine Central's property.   After considering the intent of the parties and the circumstances existing at the time of the creation of the easement, the court also determined that the scope of the easement did not include "the right to install utility services or use as residential access."   This appeal followed.

## II.  DISCUSSION

[¶ 9]   The parties agree that the easement historically had been used only for agricultural and recreational purposes. Connolly and McCatherin contend that the scope of an implied quasi-easement should be interpreted broadly and that, despite the historic use of the easement, they should be permitted unrestricted use of the easement because there is no evidence that the original grantor and grantee intended to limit its scope.   Maine Central contends that the intent of the original grantor and grantee fixes the scope of the easement to its historic use as a farm crossing.   We therefore consider (A) the standard by which a court determines the scope of an implied quasi-easement, and (B) the application of the standard to the circumstances of this case.

[¶ 10]   We review a court's findings of the circumstances surrounding the creation of a quasi-easement for clear er-

ror. *See Bowers v. Andrews*, 557 A.2d 606, 607 (Me.1989). However, the extent to which those circumstances give rise to a quasi-easement is a question of law that we review de novo. *See id.*

## A. Determining the Scope of an Implied Quasi–Easement

■ [¶ 11] Connolly and McCatherin contend that the court interpreted the scope of their easement narrowly according to a standard for analyzing vague express easements, *see Guild v. Hinman*, 1997 ME 120, ¶ 6, 695 A.2d 1190, that does not apply to implied quasi-easements.

■ [¶ 12] An implied quasi-easement arises when, at the time of a conveyance, a servient estate is severed from a dominant estate and there exists an apparent and open use over the servient estate that is so obvious and clearly beneficial to the enjoyment of the dominant estate that it is reasonable to infer that the parties to the conveyance intended that the use continue. *Northland Realty, LLC v. Crawford*, 2008 ME 92, ¶ 13, 953 A.2d 359; *McGeechan v. Sherwood*, 2000 ME 188, ¶ 57, 760 A.2d 1068; *LeMay v. Anderson*, 397 A.2d 984, 987–88 (Me.1979). The ultimate inquiry regarding the existence of an implied quasi-easement is the nature of the pre-existing use and whether the parties to the original conveyance intended that use to continue. *McGeechan*, 2000 ME 188, ¶ 57, 760 A.2d 1068; *Robinson v. Me. Cent. R.R. Co.*, 623 A.2d 626, 627 (Me.1993); *LeMay*, 397 A.2d at 989. "Only the circumstances at the time of that conveyance,

therefore, are relevant," and any "ambiguities with respect to whether an easement was impliedly reserved [are] resolved in favor of the [servient estate]." *LeMay*, 397 A.2d at 987–89. Because an implied quasi-easement derives from such a focused inquiry and a limiting rule of construction, its scope is necessarily narrow.

■ [¶ 13] Implied quasi-easements arise from a reasonable inference of what the original parties intended. The law thus implies what is necessary to achieve fairness to protect the dominant estate holder from his or her own failure to reserve the easement expressly. The restrained approach to implied quasi-easements reflected in our earlier decisions, *see, e.g., LeMay*, 397 A.2d at 987, 989, does not assume that the original parties anticipated that the use made of the easement would change substantially with the development of the dominant estate, unless the court finds that the original parties had that intent. This restrained approach is consistent with our narrow construction of the scope of other types of servitudes that are defined by the intent of the creating parties.[1]

[¶ 14] In this case, the court determined the scope of Connolly and McCatherin's implied quasi-easement by considering the circumstances immediately prior to the conveyance that gave rise to the quasi-easement, using those circumstances to infer the intent of the original parties to the conveyance, and then limiting the scope of the implied quasi-easement to its originally-intended purposes. The court reasoned:

---

1. For instance, with respect to an express easement, we recognized that although "[t]he use of an easement may vary from time to time with what is necessary to constitute full enjoyment of the premises[,] ... [a]ny changes in use ... must be consistent with the purpose for which the easement was originally granted." *Guild v. Hinman*, 1997 ME 120, ¶ 6, 695 A.2d 1190 (citations omitted) (quotation marks omitted). Similarly, we

have interpreted the scope of prescriptive easements narrowly "to give effect to the intention of the parties ascertained from ... circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created." *Flaherty v. Muther*, 2011 ME 32, ¶ 83, 17 A.3d 640 (quoting Restatement (Third) of Prop.: Servitudes § 4.1(1) (2000)) (quotation marks omitted).

The evidence of record and reasonable inferences lead the Court to find that Sylvester Hewes had used his property for agricultural purposes prior to the purchase by the railroad.... As explained in *Guild v. Hinman*, [1997 ME 120, ¶ 7, 695 A.2d 1190], concerning the scope of rights-of-way, in order to support installation of utility lines as within the scope, "[t]he trial court must ascertain the objectively manifested intention of the parties in light of circumstances in existence recently prior to the conveyance." ... In the present case, the Court has found the necessary implied intent to support the easement, but there is no evidence to support a scope of that easement beyond allowing a "farm crossing." Therefore, the Court cannot declare an easement [that] includes the right to install utility services or use as residential access.

There was no error of law in the court's analysis, which was consistent with our established law regarding implied quasi-easements. *See McGeechan*, 2000 ME 188, ¶ 57, 760 A.2d 1068; *LeMay*, 397 A.2d at 987–89.[2]

B. The Standard Applied to the Circumstances of this Case

[¶ 15] Connolly and McCatherin assert that there is no evidence to support the court's finding that the original grantor and grantee intended to limit the scope of the easement to any extent. With this argument, however, they suggest an improper assignment of the burden of proof to Maine Central.

[¶ 16] The party asserting the existence of an easement bears the initial burden of proof. *LaBelle v. Blake*, 1998 ME 165, ¶ 9 n. 3, 714 A.2d 145; *see also Amodeo v. Francis*, 681 A.2d 462, 465–66 (Me. 1996) (placing the burden on the party asserting an easement by necessity to prove that access to a property by the water was impractical and the property was thus landlocked). Because Connolly and McCatherin were asserting an implied quasi-easement for residential purposes, they had the initial burden to prove that the circumstances existing at the time of Hewes's conveyance to the Penobscot & Kennebec Railroad Company included such a use and that those parties intended to have that use continue. *See McGeechan*, 2000 ME 188, ¶¶ 57–58, 760 A.2d 1068; *LeMay*, 397 A.2d at 988–89. Until Connolly and McCatherin carried their burden, Maine Central did not have to prove that the original parties intended to limit the scope of the easement.

[¶ 17] To the extent that Connolly and McCatherin challenge the sufficiency of the evidence to support the court's finding that "there is no evidence to support a scope of [the] easement beyond allowing a 'farm crossing,'" we review the court's finding for clear error and discern none. *See Bowers*, 557 A.2d at 607.

The entry is:

Judgment affirmed.

---

2. The property at issue in this case is adjacent to that at issue in *Robinson v. Me. Cent. R.R. Co.*, 623 A.2d 626 (Me.1993), which also involved the establishment of a similar implied quasi-easement. The two cases are, however, distinguishable. In *Robinson*, the trial court resolved whether an implied quasi-easement existed based on a summary judgment record developed by parties who were not contesting the scope of that easement. *See id.* at 628 & n. 1 (Clifford, J., dissenting) ("The Robinsons have not filed any affidavits as to the conditions existent on the land at the time of the severance...."). By contrast, in this case the evidentiary record developed at trial required the court to address not only the existence of the implied quasi-easement, but also its scope.