STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-03-38
JLH — HAN — 12/16 — ...

Kathleen Graves et al.,
          Plaintiffs


          v.                                    Decision and Judgment


S.E. Downey, Registered Land
Surveyor, P.A. et al.,
          Defendants

APR 26 2005


          Hearing on the complaint was held on April 27, April 28, May 21 and June 5,
2004. On each hearing date, plaintiff Kathleen L. Graves, defendant Patrick J. Downey,
and counsel for the parties were present. Plaintiff David C. Graves was not present for
trial, and defendant Stephen E. Downey was present for portions of the proceedings.

          The plaintiffs own a parcel of land located in the Town of Bar Harbor. They
decided to subdivide the parcel into three smaller lots. One lot (the most northerly of the
three) would be conveyed to one of their sons; the second would go to a family friend and
contractor, Stephen Robbins; and they planned to hold the remaining land and transfer it
to another son at some future date. In return for the transfer of land to him, Robbins
agreed to act as a general contractor to improve the subdivided lots.

          Defendant S.E. Downey, Registered Land Surveyor, P.A. is a professional service
corporation and is engaged in the business of surveying. Defendant Stephen Downey is
the president and sole shareholder of the business and, at times relevant to this case,
defendant Patrick Downey (Stephen's son) was employed by and worked for the
business. Because Stephen Downey did surveying work for Robbins previously, in early
1999 Robbins secured the professional services of the Downey firm to conduct a survey
of the entire Graves parcel and create the three new interior lots.

          Patrick Downey was principally responsible for the surveying work. He was
finishing his term as surveyor in training, and Stephen Downey wanted Patrick to manage

1

the project. Stephen's essential role was to supervise Patrick's work. Indeed, when Robbins first contacted Stephen Downey, Stephen referred Robbins to Patrick. In spring 1999, Patrick Downey produced a survey. *See* joint exhibit 1. On the basis of this surveying work, Robbins substantially constructed a house on the northerly eight acre lot that was to be conveyed to the plaintiff's son. The construction process included improving a road that constituted a boundary of the plaintiffs' lot, providing power, installing a septic system and drilling a well. Robbins framed, sided and enclosed the exterior of the house, which was set on a slab foundation. He also had erected the chimney. The house and the associated improvements were all located within the area that Patrick had surveyed to be the new lot, which in turn was within the plaintiff's parcel, according to the Downey survey.

The easterly side of the Graves parcel is bounded by federally owned land, which is part of Acadia National Park. The land abutting the northern boundary of the plaintiffs' parcel is subject to building restrictions imposed and controlled by the Park.[1] While the construction process was ongoing, the Park was in the process of having its own survey work performed on its property. The surveyor, Richard Day, learned of the construction work on or near the Graves property, and, suspecting that the locus of the construction was actually on property that was subject to federal restriction, he alerted Park officials to the situation. One or two meetings were held at the Park's headquarters. Park Superintendent Michael Blaney, Kathleen Graves, her attorney, Day and Patrick Downey were present for at least one of the meetings. At that meeting, Day expressed his opinion that the new house had been constructed beyond the boundaries of the Graves

---

[1] The evidence does not appear to include any direct evidence that the Park had such control over that northerly parcel, which is owned by one Shepard Harris. However, the court finds that the Park in fact had the legal authority to prohibit the type of construction at issue here. This finding is based on, among other things, Kathleen Graves' testimony about the position maintained by the Park during the Graves' efforts to resolve the problem. For the reasons she described, the Park apparently was the party that rejected the possibility of some accommodation that would have allowed the house to remain at its original location. Indeed, there was such little question about the Park's rights that the Graves ultimately arranged to move the house from its original location to one that was more clearly within the boundaries of their lot. Finally, the very fact that the Park involved itself in this matter is indirect evidence of its right to control development in the location of the new house.

2

lot, and Day explained his reasons supporting that conclusion. Despite Patrick Downey's testimony to the contrary, the court finds that Patrick was given full opportunity to explain why, in his view, the house was located on the Graves land. Despite direct inquiry posed to him, he did not attempt to justify his opinion in any meaningful way.

As a result of this problem, the Graves made vigorous attempts to resolve the apparent encroachment. The owner of the land where the house apparently was located in fact expressed some willingness to reach an accommodation. However, the Park refused to allow the house to remain at the site, which, it continued to assert, was not within the Graves parcel. The Graves also sought the intervention of members of Maine's congressional representatives, but that effort was also unsuccessful. Ultimately, the Graves came to realize that they would be unable to let the house remain in its original location. They arranged to have the house moved to a site that indisputably was on their property. This process was more extensive than transporting the house itself, because the relocation required a new foundation, a new septic system, a new well and other work. The cost of this work amounted to $110,589.00. *See* plaintiffs' exhibits 10-23.

In this action, the Graves allege that the defendants breached their contract for surveying services and that the defendants were negligent.

In addition to opposing the plaintiffs' substantive allegations, the defendants raise several formal arguments. They contend first that the court cannot reach the merits of the plaintiffs' claims, because an analysis of their causes of action requires the court to determine where the boundaries of the plaintiffs' parcel is located on the face of the earth. This, the defendants argue, cannot be accomplished unless all abutting property owners are joined as parties in this action. This argument fails for two reasons. First, it does not appear that the defendants have preserved this issue. Pursuant to M.R.Civ.P. 12(b), a rule 12(b)(7) motion to dismiss for failure to join an indispensable party under rule 19 is waived if not asserted in a responsive pleading.[2] Here, the defendant's amended responsive pleading did not raise the issue.

---

[2] The defendants have expressly framed this argument as a motion to dismiss the complaint for failure to join an indispensable party under rule 19. *See* "Defendant's

Second, even if the defendants have preserved this argument, then it fails on its merits. If this action constituted one for a declaratory judgment that would "resolve ownership rights" among persons who are not parties to the action, then joinder of those missing parties would be required. *See Lamson v. Cote*, 2001 ME 109, ¶ 18, 775 A.2d 1134, 1139. It simply stands to reason that the court cannot adjudicate the rights of persons who are denied the opportunity to participate in that adjudicatory process. Here, however, the plaintiff's claims are not intended to bind the federal government, Shepard Harris or any other nearby property owner. Rather, the plaintiffs seek an award of compensatory damages based on theories of contract and tort. Although those claims implicate questions of property ownership, the property interests of non-parties are not at stake here because, among other reasons, they cannot be bound by any adjudication flowing from this action. Thus, the presence of adjoining landowners is not necessary as a predicate to resolution of the plaintiff's claims.

Next, the individual defendants argue that they cannot be held personally liable, because they acted as employees or other agents of the corporate defendant and that they are protected by the corporate veil. An entity named "S.E. Downey, Registered Land Surveyor, Inc." was incorporated in April 1989. *See* plaintiff's exhibit 33. In October 1989, the corporation filed a certificate of correction because some provisions of the articles of incorporation were incorrect. Among other things, the name of the entity was corrected to be, "S.E. Downey, Registered Land Surveyor, P.A." *Id.* Further, the instrument filed in October 1989 clarified and established that the firm "shall be organized under the Professional Service Corporation Act (13 M.R.S.A. § 701 *et seq.*)." *Id.* Although the business continued to operate under the original name ("S.E. Downey, Registered Land Surveyor, Inc."), in fact the business existed under and was defined by the provisions of the Professional Service Corporation Act.

The background of this corporate activity has two effects here. First, it establishes that the Graves have brought suit against the proper corporate party ("S.E. Downey, Registered Land Surveyor, P.A., formerly known as S.E. Downey, Registered Land Surveyor, Inc.").

---

Motion for Judgment as a Matter of Law Pursuant to M.R.Civ.P. 50(d) and 19," at pp. 10-11.

Second, the nature of the corporation informs the legal exposure of the two individual defendants. The professional services corporate structure does not immunize a person who renders the professional service from claims arising from that service. *See* 13 M.R.S.A. § 753(1). Thus, although Patrick Downer was an employee of the corporation, he is personally liable for damages resulting from negligence that affected his work. Further, Stephen Downey, as the sole corporate shareholder, *see* plaintiff's exhibit 33, is jointly and severally liable with the corporation to the extent that he "[p]ersonally and directly participated in rendering that portion of a professional service" that was rendered negligently, or to the extent that he "[d]irectly supervised and controlled that portion of a professional service rendered by another person that was performed negligently or in breach of any other legal duty." 13 M.R.S.A. §§ 753(3)(A), (B). Here, Stephen Downey reviewed Patrick's fieldwork and deed research. As Stephen himself testified, he (Stephen) was centrally and necessarily involved in the preparation of the defendants' final product, which was the survey plan (joint exhibit 1). Thus, Stephen is personally liable for any negligence affecting the services embodied in the survey and the underlying work.

The defendants miss the mark by arguing that the plaintiffs have not proven that the corporate veil should be pierced. As the plaintiffs correctly note, the veil piercing analysis is inapposite here because the provisions of the statutes that govern professional services corporations provide for personal liability in the first instance. Therefore, because the corporation chose to become organized under the Professional Service Corporation Act, the two individual defendants are proper party-defendants.

This brings the analysis to a consideration of the core of this case, namely, whether the plaintiffs have established that the defendants were negligent in performing the surveying work for the plaintiffs. Maine law does not contain authority that defines the standard of care applicable to land surveyors. However, the court draws on law applicable to other claims of professional negligence. For example, in cases of medical malpractice, the plaintiff must prove that the medical provider deviated from the standard of care that an ordinarily competent provider would satisfy under similar conditions. *See McLaughlin v. Sy*, 589 A.2d 448, 452 (Me. 1991). Similarly, an attorney is charged with using the skill, prudence and diligence that would be used by lawyers of ordinary skill

and capacity. *See Schneider v. Richardson*, 411 A.2d 656, 657 (Me. 1979). Thus, when these standards are applied to the present context, the resulting formulation requires the plaintiffs to prove that the quality of the defendants' surveying work fell below that level that an ordinarily and reasonably competent land surveyor would provide under like circumstances. And as is true in the conventional negligence analysis, the mere fact of a loss is not evidence of negligence.

This case turns on the competing opinions of the defendants and of the surveyor who worked for the Park, Richard Day. *See* joint exhibit 1 (defendants' map), joint exhibit 2 (Day's map). Both opinions embody a parcel that is shaped very similarly. In other words, there is no material dispute about the size and shape of the plaintiff's parcel. However, there is fundamental disagreement about where the parcel is located on the face of the earth. The location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, 796 A.2d. 41, 48. To determine that location from a deed description, the court must determine the intent of the parties to that deed. *Id.* If the facts extrinsic to the deed description are affected by a latent ambiguity, then a parcel's boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id.* A "latent ambiguity" is "an uncertainty which does not appear on the face of the instrument, but which is shown to exist for the first time by matter outside the writing when an attempt is made to apply the language to the ground." *Slipp v. Stover*, 651 A.2d 824, 826 (Me. 1983) (punctuation omitted). An adjoining tract is a monument if it is identified as a boundary in the deed. *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996).

Here, the record description of the plaintiffs' parcel refers to several monuments. *See* defendants' exhibit 2. Most could not be found. The only monuments that currently exist (or, at least, the only ones that were located) are the boundaries of the adjoining parcels as stated in the record description, and the Old Sled Road. This results in a latent ambiguity that requires resort to monuments and other information.

The parties agree that the road forms the easterly boundary of the plaintiff's land.[3] The record description of the plaintiffs' parcel identifies its southern line as the northern

---

[3] While testifying, however, Patrick Downey attempted to maintain that the Graves' ownership interest extended to the center of the Old Sled Road. The deed creating the

6

boundary of Tracy's property.[4] The court finds that Patrick Downey made a critical error in his treatment of this crucial aspect of the plaintiffs' deed description. Downey acknowledged that the Tracy parcel is a monument. However, he did not locate the relevant aspect of that monument (namely, the northern boundary, which is also the southern boundary of the plaintiffs' parcel). Downey did realize, however, that there was a gore, or gap, between the Tracy land and the plaintiffs' parcel. He testified that he did not try to resolve the gore by closing it. However, because the northern boundary of the Tracy parcel *is* the southern line of the plaintiffs' property, there cannot be a gore.

Day, on the other hand, thoroughly investigated the location of the Tracy property. Partly on the basis of granite markers, the court finds that he established the location of that parcel. This, then, is powerful evidence of the location of the plaintiffs' parcel. When the parcel, as configured by all surveyors here, is located with reference to that southerly line, it is manifest that Downey set the parcel too far northerly and conveyed incorrect information that the house site was within the plaintiff's parcel.

Downey also testified that he considered an old metal fence that Robbins pointed out when they met at the site. This fence is close to where Downey placed the southerly line of the plaintiff's land. For several reasons, it was not reasonable for Downey to place any meaningful weight on this factor. First, Downey knew that Robbins was not the owner of the land but rather was simply acting on the plaintiffs' behalf. This clearly should indicate that Robbins may have been unlikely to have sound information about the parcel. Second, although Robbins in fact directed Downey's attention to the fence, Robbins did not know where the boundary was located, and the court does not find that Robbins fairly conveyed an impression that he had such information. If Downey wanted

---

parcel on the other side of the road is senior to the one that created the plaintiffs' parcel. *See* defendant's exhibits 6 and 7 (the former was recorded prior to the latter). As Downey finally recognized and agreed, the senior deed established a parcel that extends to the western side of the road. Because the conveyance to the plaintiff's predecessor occurred only later, the Graves' easterly boundary is the western edge of the road. Downey's flawed analysis on this point does not reflect favorably on the quality of his work at issue, particularly because he insisted that he reviewed the abutter's deed, which in fact should have made clear the location of the boundary.

[4] The Tracy property has gone through several subsequent owners and is now the site of the local high school.

7

to consider the significance of the fence, he should have made concrete inquiry of Robbins to determine if the information was worthwhile. Finally, the fence is not a monument described in the plaintiffs' deed and is thus not entitled to the weight allowed by the *Hennessy* framework. Consequently, the fence loses much of its significance because of the weight that must be assigned to the location of the Tracy land.

In forming his opinion of the location of the plaintiffs' parcel, Downey placed considerable weight on information associated with property formerly owned by Knowles. Downey attempts to draw a connection between the two parcels derives mostly from a 1979 "plan" prepared by Robert Raynes. *See* defendant's exhibit 4. That survey depicts an extension of the northwest boundary of the Knowles property. The extension runs in a southwest direction for 1660 feet, according to the plan. At that distance point, a line is drawn in a northwest direction, which, in Downey's view, after another 1335 feet, is the beginning of the northern line of the plaintiffs' property.

The court finds that it was unreasonable for Downey to resort to the Knowles lot in an effort to locate the plaintiffs' parcel. First and most importantly, there is no established connection or relationship between the two parcels. The plaintiffs' deed description does not refer to the Knowles lot, and the deed description for the Knowles lot does not refer to the plaintiffs' lot. Indeed, the two parcels are approximately one-half mile distant. The extension lines and associated distances on the Raynes plan itself are the only bases on which to argue that a connection exists. However, the source and significance of the crucial link – the distance call of 1660 feet – is not known. Although the plan includes the word "deed" next to the stated distance, that distance is not part of the deed description for the Knowles property. As even the defendants' expert noted, this information should be investigated before it is used as the basis for a survey opinion. Here, if that investigation was conducted, it was fruitless.

Further, the location and accuracy of the 1660 foot distance call is called into question in two ways. The Raynes opinion indicates that a pin was placed at the terminus of that line. No pin was found. Even beyond this, the accuracy of other distances on the Raynes plan is uncertain, because the found distance between the pins marking the corners of the Knowles parcel itself is different than the distance noted on the plan. This should create uncertainty about other distances noted on the Raynes plan, including the

actual length of the line marked as 1660 feet long. Even under Downey's analysis, the length of that line bears directly on the location of the northern line of the plaintiffs' property. If that line is longer than 1660 feet, then as Downey has used that information, the plaintiffs' parcel would be shifted in a southerly direction, toward the location that Day urges.

For these reasons, even when information about the Knowles lot is examined in isolation, it reveals substantial flaws, rendering reliance on it as unreasonable. However, when this flawed information is then compared to evidence about the location of the Tracy lot, then reliance on the Knowles parcel become even more problematic, because the location of the Tracy lot, which Day established, is front-line evidence that, under *Hennessy*, deserves the highest qualitative significance. To the extent that the information derived from the Knowles lot is contradicted by evidence associated with the location of the Tracy parcel, the former loses considerable additional ground.

Finally, Downey relied on the description of the Old Sled Road, as found in the plaintiffs' deed description, to support his opinion that the plaintiffs' land is located more northerly than Day believes. This reliance is also flawed. The road has greatest significance as a monument, and the parties properly agree that the deed reference serves that purpose. The road's courses and distances contained in the deed description are given less significance than other monuments, such as the Tracy parcel, and therefore yield to those landmarks.

The defendants argue that the configuration of the road, as it is described in the plaintiffs' deed and depicted in an overlay used at trial, demonstrates that the boundary created by the road is more northerly than Day suggests. *See* defendants' exhibit 8 (overlay, to be used in conjunction with joint exhibit 2). However, the depiction in the overlay is no more than the courses and distances that take a backseat to monuments. Nonetheless, the defendants argue that when the overlay is superimposed over the competing representations of the location of the plaintiffs' land, it supports their position. The overlay generally does match up better with the boundary section of the road as envisioned by the defendants, compared to Day's opinion. However, to make the match that is favorable to the defendants, the orientation of the entire parcel is changed significantly – approximately 100 feet in places, which is the deviation between the

overlay and Day's location of the boundary section of the road that the defendants claim weakens his opinion.

Finally, the weak character of the quantitative information provided about the road in the deed is confirmed by the 300 foot discrepancy between the length of the boundary as stated in the deed description and the length of the that section of the road as Downey himself plotted in on the survey.

The defendants challenge Day's opinion more generally because he was not commissioned to conduct a survey of the plaintiffs' parcel itself, because his plan is not a formal survey, and because he did not plot certain parts of the plaintiffs' parcel, such as the western boundary. However, the court does not find that these issues weaken Day's opinion. When he learned of the possible encroachment, the Park directed him to study the issue, and for that reason he paid particular attention to the central issue in this case, namely, the location of the plaintiffs' property. This required him to spend considerable time in the area, in part because of some ongoing efforts to resolve the problem. Further, the court finds that Day's approach was open-minded. At the meetings among the parties and Park officials, Day encouraged Patrick Downey to articulate the basis for his conclusion that the new house was on the plaintiffs' parcel.

The court has noted several material flaws in the survey work performed by Patrick Downey and directly supervised by Stephen Downey, which work was then incorporated into the survey opinion attributable to both Patrick and Stephen Downey. The most significant of these problems was the failure to use the northern boundary of the Tracy property as the direct means to establish the location of the southerly line of the plaintiffs' property. This constituted a deviation from the standard of care and conduct that an ordinarily competent surveyor is expected to meet. It is also a breach of at least one of the standards of care set out in the rules that govern the quality of surveyors' work. *See* defendants' exhibit 9, ch. 5, § 2.A.2.d (requiring a surveyor to conduct a careful evaluation of the subject before expressing a professional opinion). The parties also argue on the basis of an earlier set of standards. *See* plaintiff's exhibit 1. Plainly, aspects of Downing's fieldwork and research complied with these criteria. However, in other aspects, he fell short. In particular, he did not properly apply the rules of evidence, required by section 12.10.8.6, as revealed by his problematic use of the Knowles lot and

10

his willingness to give little or no effect to the described monument of preeminent importance: the northern boundary of the Tracy parcel. These flaws in the Downings' work resulted directly in the ultimate error. For these reasons, the court finds that the defendants breached their contract with the plaintiffs because they failed to discharge their contractual responsibilities in a reasonable manner, and the court finds that they acted negligently with respect to the service they were hired to perform.

The court further finds that the defendants' actionable conduct was the legal cause of the plaintiffs' damages. Although the defendants argue that the plaintiffs acted prematurely when they moved the house, the evidence establishes that the Park gave them no choice. More importantly, the evidence establishes that, due to the flawed information provided by the defendants, the house in fact was built on property that the plaintiffs did not own. Thus, the Park was within its rights to insist that the plaintiffs remedy the problem, and the plaintiffs sustained their losses at that time. There was no need, as the defendants appear to argue, to wait until the Park elected to pursue legal action. The evidence at bar demonstrates that the outcome was inevitable.

The evidence also indicates that when the plaintiffs learned of the boundary problem, Robbins continued to do some work on the house while the plaintiffs were trying to work out a resolution with the Park. This additional work, however, did not increase the plaintiffs' damages. Rather, the expenses incurred to relocate the house flowed from the status of the construction, prior to the revelation of the boundary issue. Thus, the plaintiffs are entitled to damages in the full amount they claim.

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiffs and against the defendants, jointly and severally, in the amount of $110,589.00, plus pre-judgment interest at the annual rate of 2.53%, post-judgment interest at the annual rate of 7.41%, plus their costs of court.

Dated: December 13, 2004

_____
Justice, Maine Superior Court

**FILED & ENTERED**

**DEC 16 2004**

11

**SUPERIOR COURT HANCOCK COUNTY**