STATE OF MAINE                                    SUPERIOR COURT
YORK, SS.                                         Civil Action
                                                  Docket No. RE-16-44

THOMAS W. MERRILL &
MARY R. MERRILL,

        Plaintiffs,

v.                                                **ORDER**

SACO VALLEY LAND TRUST,

        Defendant.


Plaintiffs Thomas W. Merrill and Mary R. Merrill move for summary judgment on Counts I and II of their three-count complaint for declaratory judgment. Plaintiffs' complaint stems from an objection defendant Saco Valley Land Trust ("SVLT") raised to the sale of plaintiffs' property to the Ecology School pursuant to a conservation easement burdening the plaintiffs' property in Saco. In Count I, plaintiffs seek a declaration that the Ecology School's proposed use of the property is not a "commercial" use prohibited by the easement. Count II seeks a declaration that new structures proposed by the Ecology School have been permitted under local land use laws and that the "local land use laws" referenced in the easement are not limited to the laws in effect on the date the easement was executed. For the reasons discussed below, the court grants in part and denies in part plaintiffs' motion for summary judgment.

I.      **Factual Background**

In 1998, Thomas Merrill's Aunt, Mary D. Merrill, placed approximately 105 acres of her land in Saco, Maine (the "Property") under a conservation easement recorded in the York County Registry of Deeds at Book 8640, Page 232 (the "Easement"). (Supp'g S.M.F. ¶ 1.) The Easement divides the Property into two areas: approximately 96 acres are designated as the

1

"Protected Property" or "Protected Portion" and 8.75 acres are designated as the "Residence/Farm Area" or "Residential/Farm Area.' (*Id.* ¶¶ 2-3.) Defendant Saco Valley Land Trust ("SVLT") was chosen by Ms. Merrill to be the holder of the Easement. (*Id.* ¶ 4.)

## A. Pertinent Terms of the Easement

The Easement explains that its dominant purpose is to "preserve and protect in perpetuity the natural, farmland, scenic, agricultural, open space pastures, ecological and wildlife habitat features and rural character of the Protected Property…to foster the continuation of responsible conservation practices and farming, and to prevent any use of the Protected Property that would significantly impair or interfere with the scenic and conservation values of the Protected Property." (Supp'g S.M.F. ¶7.) The Easement was created pursuant to "the Uniform Conservation Easement Act, Title 33, Maine Revised Statutes, Sections 476 through 479-B, inclusive, as amended; and…the Internal Revenue Code of 1986 as amended…Title 26, U.S.C.A., Section 170(h)(1)-(6) and Section 2055 and 2522, as amended…." (Ex. A to Anderson Aff., Easement, p. 1, 2nd & 3rd Whereas clauses) (emphasis added). Additionally, the SVLT is qualified to hold the Easement "pursuant to Title 33, [M.R.S.A.] Section 476(2)(B), as amended, and is a qualified organization under Title 26 U.S.C.A. Section 170(h)(1)-(6), as amended…." (*Id.* at p. 1, 4th Whereas clause) (emphasis added).

> The Easement provides the following pertinent restrictions on uses of the Property:
>
> Commercial, industrial, and quarrying or other surface mining activities are prohibited on the Protected Property. In addition and for the benefit of the Holder, the prohibition on commercial use shall also apply to and encumber the Grantor's remaining land and buildings shown on Exhibit B as Residence/Farm Area. Commercial uses prohibited shall not include foresting or agriculture, including animal husbandry and on-site sale of produce.

(Easement p. 3, § 2). The Easement also restricts the presence of structures on the Protected Property and provides that "[a]dditional structures shall be permitted in the Residence/Farm Area

2

as long as they are permitted by local land use laws and are in keeping architecturally with the other structures in the Residence/Farm area." (*Id.* at p. 4, § 3.)

The Easement further provides:

> The fact that any of the uses prohibited herein, or other uses not mentioned, may become more economically valuable than permitted uses, or that neighboring properties may in the future be put entirely to such non-permitted uses, has been considered by Grantor in granting this perpetual Easement. It is Grantor's belief that any such changes will increase the benefit to the public of the continuation of this Easement, and it is the intent of both the Grantor and Holder that any such changes should not be deemed to be changed conditions permitting termination of this Easement.

(*Id.* at pp. 7-8, § 14(c).)

B. The School and its Plans

On September 2, 2015, plaintiffs and The Ecology School entered into a purchase agreement for the School to acquire the Property. (Supp'g S.M.F. ¶ 23.) The School is a 501(c)(3) non-profit educational organization. (*Id.* ¶ 24.) Andrew J. Dumsch, the executive director of the School, asserts that it conducts programs to foster stewardship for the environment by educating youths and adults in the science of ecology and the practice of sustainable agriculture. (Dumsch Aff. ¶ 4.) The School asserts that it intends to acquire the Property in order to operate day and weekly educational programs, including food production farming, woodlot and sustainable natural resource management, four season growing, forest gardening, perennial based food production and harvesting, historical assessments of orchard and farming practices, and agro-ecology focusing on conservation and soil management practices. (*Id.* ¶ 5.) The School claims that as part of its operation, it intends to construct several new buildings within the Residence/Farm Area as part of a "green campus" that can accommodate up to 120 weekly program students and approximately 10 seasonal staff. (*Id.* ¶ 6.) The School intends to charge fees for its programs, but asserts that its proposed dorms/dining hall are not

3

commercial hotels with a restaurant and are instead "dormitory" style housing paid for as part of tuition by schools that send students to the School for educational programs and that such offerings simply offset expenses inside the non-profit framework of the School's operation. (*Id.* ¶ 7.)

The School claims that no temporary or permanent structures will be constructed on the Property, aside from those expressly permitted under Section 3 of the Easement, and that the Protected Property will be used exclusively for farming, education, conservation, and recreation consistent with the stated purposes of the Easement. (*Id.* ¶ 8.) The Ecology School has not proposed to alter, demolish, or otherwise modify the existing structures within the Residence/Farm Area, including the existing house, garage, and apartment. (*Id.* ¶ 9.) The School asserts that its goal or aim is not to earn a profit. (*Id.* ¶ 10.)

Richard Rhames, the President of the SVLT, asserts that the SVLT obtained and reviewed copies of records through the Freedom of Access Act including a proposed budget for the School and email from Mr. Dumsch acknowledging that the information may feed into concerns people had about the size of the project and that the information should be kept confidential. (Rhames Aff. ¶ 13.) Mr. Rhames also asserts that a draft budget for the School through 2019 shows the School's plan to increase revenue by 124% by 2019. (*Id.* ¶ 14.) Mr. Rhames did not, however, attach the referenced documents to his affidavit.

C. The SVLT's October 2, 2015 Email and the School's Contract Zone Application

On October 2, 2015, Mr. Rhames wrote plaintiffs that SVLT has struggled with the issues presented by the School's proposed institutional use of the Property and that the trust "requires a well developed plan, unlike the (barely) conceptual proposal that has been presented to date, before determining if the proposed Ecology School development conforms to the easement."

4

(Ex. B to Anderson Aff., Rhames Email.) The email concludes that "[i]t may be, with a well developed proposal passing municipal muster as consistent with 'local land use laws,' and the matters of scale spelled out and made clear through the municipal planning process, that the Trust will find the proposal in keeping with the terms of the easement perpetually in our care. Until that time however, we must reserve judgment." (*Id.*)

Shortly after receiving SVLT's October 2 email, the School submitted an application for a contract zone to the City of Saco to permit the operation of the School on the Property (the "Contract Zone"). (Supp'g S.M.F. ¶ 34.) The School asserts that its application included a description of the proposed curriculum and specific requirements for the type and size of structures proposed as part of the campus within the Residence/Farm Area. (Dumsch Aff. ¶ 14.) Mr. Rhames responds that, to the knowledge of the SVLT, the zone change application did not include a site plan showing the location and size of the buildings, parking areas and other relevant parts of the School's infrastructure. (Rhames Aff. ¶ 12.) Mr. Rhames further asserts that the SVLT has only been provided vague and incomplete schematics as to the proposed school plans. (*Id.*) Although the parties disagree as to the extent of the School's application, they agree that the School has not submitted a final development plan to SVLT, including specific renderings of any structures. (Supp'g S.M.F. ¶ 31.) The School's contract zone application is not in the record.

D. The City Approves the School's Contract Zone Application

After numerous meetings and public hearings before the Saco Planning Board and the Saco City Council, the City Council approved the School's Contract Zone by a vote of 5-2 on February 1, 2016. (Supp'g S.M.F. ¶ 36.) In its written decision, the City concluded that an "ecology school with residential programs, field trips, and outreach programs to schools,

5

workshops, curriculum design, camps and events is a permitted use of the Property." (Ex. C to Anderson Aff., City Decision § III(A).) The City further determined that the Contract Zone permitted two dormitories of up to nine-thousand square feet of floor area subject to a 34-foot height cap, and capable of housing 120 students. (*Id.* at § III(B).) The City determined that the Contract Zone also permitted a 7,000 square foot structure to be used as a dining hall, kitchen, and classroom. (*Id.*)

Additionally, the City reviewed the Easement and had solicited comments from SVLT during the Contract Zoning process. (Supp'g S.M.F. ¶ 40.) In its written decision, the City stated that the School intended to maintain the Protected Property "for farming, education, research and recreation purposes only." (*Id.* ¶ 41.) The written decision further provided that the "green campus" proposed by the School, including the new structures authorized by the Contract Zone, would be constructed only within the Residence/Farm Area, which the Council noted was "not under a conservation easement." (City Decision § II(E).) The decision stated, when approving the proposed structures, that "non-commercial architecturally appropriate development is allowed under the conservation easement on the approximately 8.75 acres of the property, meaning the Residence/Farm Area. (*Id.* at § V(A)(3).) The decision further explained that the C-1 district is "designated for areas which are predominantly agricultural in character." (*Id.* at § V(C).) The City determined that the Schools' proposed use is "consistent with the existing uses and permitted uses within the original zone," meaning the C-1 District. (*Id.*)

E. The SVLT's Letter

On February 26, 2016, two weeks after the City approved the Contract Zone, SVLT wrote plaintiffs a letter informing them that the School's proposal was prohibited by the Easement. (Supp'g S.M.F. ¶ 46.) The letter stated, "The Ecology School is a commercial use and

6

is therefore prohibited under Paragraph 2 of the Conservation Easement." (*Id.* ¶ 47.) The letter explains that "[w]hether the School is nonprofit or not, we believe that a large boarding school type institution is, for all intents and purposes, a commercial use." (*Id.* ¶ 48.) The letter continues that "[i]t would be an absurd outcome if a 'for-profit' educational institution (like Kaplan University) is prohibited while a similar non-profit is allowed." (*Id.* ¶ 49.)

The letter goes on to state, "Paragraph 3 of the Conservation Easement allows additional structures which are permitted by local land use laws and are 'in keeping architecturally with other structures in the Residence/Farm Area.' We contend that Mrs. Merrill meant local land use laws in effect at the time of the grant of the easement. We understand that contract zoning in Saco did not even exist at that time. [The Easement] could easily have stated land use laws 'as amended' but did not do so." (*Id.* ¶ 50.) The letter also stated that SVLT has authority under Section 9 of the Easement to ensure that structures proposed in the Residence/Farm Area do not adversely impact the Protected Property. (*Id.* ¶ 51.) The letter goes on to list other grounds for its conclusion including concerns regarding architectural compatibility and the impact of the operation of the School on the Protected Property. (*Id.* ¶ 52.) Prior to sending the letter, SVLT stated that it was "willing to consider more fully the proposed scale and scope of the proposed project" and to review "your detailed site plans once they are ready for submittal to the City." (*Id.* ¶ 53.)

## II. Discussion

### A. Summary Judgment Standard and Deed Construction

"The function of a summary judgment is to permit a court, prior to trial, to determine whether there exists a triable issue of fact or whether the question[s] before the court [are] solely...of law." *Bouchard v. American Orthodontics*, 661 A.2d 1143, 44 (Me. 1995). Summary

judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653. A "material fact" is one that can affect the outcome of the case, and a genuine issue exists when there is sufficient evidence for a fact finder to choose between competing versions of the fact. *Lougee Conservancy v. City-Mortgage, Inc.*, 2012 ME 103, ¶11, 48 A.3d 774. Summary judgment is also appropriate if, looking at the record in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, no reasonable juror could find for the non-moving party. *Id.* ¶ 14, n. 3 (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)).

The proper construction of a deed, including a restrictive covenant, is a question of law. *Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 24, 967 A.2d 690; *River Dale Ass'n v. Bloss*, 2006 ME 86, ¶ 6, 901 A.2d 908. The court must first attempt to construe the language of a deed by looking within the four corners of the instrument. *Windham Land Trust*, 2009 ME 29, ¶ 24, 967 A.2d 69 (quotation and citation omitted). In evaluating the language of a deed, the court should give effect to the common or everyday meanings of the words in the instrument. *Id.* (quotation and citation omitted). "If the language of a deed is unambiguous, it will guide interpretation of the parties' intent." *Silsby v. Belch*, 2008 ME 104, ¶ 7, 952 A.2d 218 (quoting *Bennett v. Tracy*, 1999 ME 165, ¶ 8, 740 A.2d 571. If the deed is unambiguous, the court must construe the deed without considering extrinsic evidence. *Id.*

If the language of the deed is ambiguous, and the intention of the parties is in doubt, the court may resort to rules of construction and may examine the deed in light of extrinsic circumstances surrounding its execution. *McGeechan v. Sherwood*, 2000 ME 188, ¶ 24, 760 A.2d 1068. Language is ambiguous when it "is reasonably susceptible of different

8

interpretations." *River Dale Ass'n*, 2006 ME 86, ¶ 6, 901 A.2d 908. In making this determination, the court may consider extrinsic evidence to interpret a deed and enter summary judgment where the material facts are undisputed. *See Friedlander v. Hiram Ricker & Sons, Inc.*, 485 A.2d 965, 967-68 (Me. 1984). Interpretive devices, including rules of construction, may be used to construe a deed so long as the results "are not absurd or manifestly inconsistent with the parties' intentions apparent from the face of the deed." *McGeechan*, 2000 ME 188, ¶ 24, 760 A.2d 1068 (quoting *Snyder v. Haagen*, 679 A.2d 510, 513 (Me. 1996)).

B. <u>Whether the Ecology School's Proposed Use is "Commercial"</u>

Plaintiffs argue that the court should enter summary judgment declaring the School's proposed use is not a prohibited "commercial use" within the meaning of the Easement because the term "commercial" is unambiguous and Maine courts have repeatedly found a use is "commercial" only if profit is the chief aim of the activity in question.[1] Because the School is a not-for-profit institution with no intent to earn a profit, plaintiffs argue it is not prohibited by the Easement. Plaintiffs further argue that while the School charges fees to students to cover its expenses, this is irrelevant because profit is not the School's aim and the School does not, in fact, generate profits.

SVLT responds that plaintiffs' argument is largely based on an unduly narrow reading of the term "commercial" and is not supported by the authority plaintiffs rely upon. SVLT argues that while the School's primary aim is purportedly not profit, the School does not appear to deny that its use is "of or relating to commerce." SVLT further contends that the School's proposed use would change the core agricultural use of the property and profoundly contradict the intent of

---

[1] In support, plaintiffs rely on *Sanseverino v. Gregor*, 2011 ME 8, 10 A.3d 735, *Beckley v. Town of Windham*, 683 A.2d 774 (Me. 1996); *Bushey v. Town of China*, 645 A.2d 615, *Hebron Academy v. Town of Hebron*, 2013 ME 15, 60 A.3d 774, *Silsby v. Belch*, 2008 ME 104, 952 A.2d 218; and *Salvation Army v. Town of Standish*, 1998 ME 75, 709 A.2d 727.

9

Ms. Merrill in drafting the Easement to protect the agricultural nature of the Property regardless of how lucrative (or not) it may be. SVLT also argues that the School's status as a non-profit for tax purposes does not automatically render everything the school does "not for profit." The SVLT asserts that the School's projected growth in revenue of 124%, large size, and lack of definite plans bely its claim to be not for profit and non-commercial.[2] Plaintiffs reply, in pertinent part, that SVLT's assertions regarding future revenues and budgets for the School are speculative, nonsensical, and not supported by the record.

While the Law Court has not definitively interpreted "commercial uses" to mean "activities where profit is the chief aim" in all circumstances without regard to context,[3] it has looked to and relied upon dictionary definitions of the term "commercial" as being "[o]f or relating to commerce" and "having profit as a primary aim." *Silsby*, 2008 ME 104, ¶ 12, 952 A.2d 218, 222, 2008 Me. LEXIS 104, *8 (Me. 2008); *Beckley v. Town of Windham*, 683 A.2d 774, 775 (Me. 1996) (defining "commercial" as "having profit as a chief aim" and looking to how the term is used in the law of zoning).[4,5]

---

[2] SVLT also raises a number of arguments addressing extrinsic evidence that purportedly aid in interpretation of the Easement. As discussed below, the court determines the Easement is unambiguous on this point and extrinsic evidence is not necessary.

[3] *See Hebron Acad., Inc. v. Town of* Hebron, 2013 ME 15, ¶ ¶¶24-25, 60 A.3d 774 (determining the Academy's rental activities did not interfere with its tax-exempt purpose because the activity amounted to approximately one percent of its operating budget and was a de minimis incidental use of the property); *Sanseverino v. Gregor,* 2011 ME 8, ¶¶ 9-10, 10 A.3d 735 (determining that the meanings of "single-family residential purposes" and "no commercial activity or business activity" were unambiguous within context of entire restrictive covenant and with regard to question of whether timber harvesting and road construction activities were commercial or business activities).

[4] *See also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 456 (2002) (defining "commercial," in pertinent part, as "of, in, or relating to commerce" and "from the point of view of profit: having profit as the primary aim"); BLACK'S LAW DICTIONARY 325 (10th ed.2014) (defining "commercial," in pertinent part, as "[o]f, relating to, or involving the buying and selling of goods; mercantile" and "[o]f, relating to, or involving the ability of a product or business to make a profit").

Here, reading the prohibition on "commercial uses" within the context of the entire Easement and in light of the dictionary definitions of "commercial," the plain language makes clear that the Easement prohibits uses of the Residence/Farm Area where profit is the chief aim, unless the profitable uses are foresting or agriculture. The focus on profit is demonstrated by the Easement's miscellaneous provision providing that just because "any of the uses prohibited herein…may become more economically viable than permitted uses" does not change the Easement's prohibition against such uses and does not permit termination of the Easement. (Easement, pp. 7-8 § 14(c).) Furthermore, SVLT's fears that the "core agricultural use" of the Property could be changed by such an interpretation are misplaced. Regardless of the nature of the non-profit use of the Residence/Farm Area, the Easement restricts the addition of structures to those that are "permitted by local land use laws and…in keeping architecturally with the other structures in the Residence/Farm Area." (Easement, p. 4, § 3.) In addition, interpreting the prohibition on commercial uses to only exclude uses where profit is the chief aim while permitting similar nonprofit uses is consistent with the Easement's focus on heightened restrictions governing the Protected Property as opposed to the Residence/Farm Area. (*See id.* p. 1, 1st whereas clause.)

Turning to the School's proposed use, the record is clear that the School's primary aim is not profit. The School is a 501(c)(3) nonprofit educational organizations that conducts programs to foster stewardship for the environment by educating youths and adults in the science of ecology and the practice of sustainable agriculture. (Dumsch Aff. ¶ 3.) The School intends to operate day and weekly educational programs on the Property including food production farming, woodlot and sustainable natural resource management, four season growing, forest

---

[5] While SVLT appears to dispute plaintiffs' proffered definition of the term "commercial," is has not proffered an alternative definition or interpretation.

gardening and perennial-based food production and harvesting, historical assessments of orchard and farming practices, and agro-ecology focusing on conservation and soil management practices. (*Id.* ¶ 5.) While SVLT is concerned that the School's intentions and manner of operating may change, there is no evidence supporting such a concern. Furthermore, even if Mr. Rhames' assertions regarding the Schools' anticipated growth in revenue were admissible, such growth is not inconsistent with the School's non-profit status or stated mission. Accordingly, the court grants plaintiffs' motion for summary judgment and declares that the School's proposed use is not a prohibited "commercial use" under the Conservation Easement.[6]

C. Whether the Local Land Use Laws Referenced in the Easement are Limited to Laws in Place at the Time the Easement was Executed

Plaintiffs seek a declaration that the "local land use laws" governing the permitting of additional structures in the Residence/Farm Area refer to the laws in effect at the time a permit is sought through the City of Saco. Additionally, plaintiffs seek a declaration that the School's proposed additional structures have already been permitted under local land use laws. Plaintiffs do not dispute that the Easement contains an ambiguity as to whether the "local land use laws" referenced contemplate those in effect at the time the Easement was executed, or those laws as they change over time. Plaintiffs argue, however, that the court should utilize and adopt the rules of construction that: 1) references to general laws mean the laws as they may change over time, unless there is a clear expression of contrary intent; and 2) references to specific statutory provisions refer to the law in place at the time of the reference, unless otherwise provided. Accordingly, plaintiffs assert that the general reference to "local land use laws" in the Easement

---

[6] While SVLT asserts that plaintiffs have not denied the School's proposed use is "of or relating to commerce," the record is clear that the School's use is, in fact, not of or related to commerce. Instead, the Schools' proposed use is educational in nature. *See e.g. Silsby*, 2008 ME 104, ¶¶ 8, 11-13, 952 A.2d 218 (renting rooms in a residential building for profit does not change the fundamental character of the building from residential to commercial).

12

means the laws as they exist whenever a new structure is proposed in the Residence/Farm Area. Plaintiffs argue that this interpretation is supported by the fact that the Easement has no termination date and that it must be read to apply to structures that could be proposed years or decades in the future. Additionally, plaintiffs argue that the 1998 land use code in effect at the time the Easement was enacted was not attached to the Easement and, even if a copy is available today, it may not be available in the future.

SVLT responds that the inclusion of the words "as amended," with regard to the laws under which the Easement was created, and the absence of this phrase when referencing local land use laws demonstrates the Easement intended to govern additional structures in the Residence/Farm Area based on local land use laws as they existed at the time the Easement was enacted. The SVLT further argues that the rule of interpretation which plaintiffs rely on has not been recognized or utilized in Maine. Additionally, SVLT argues that it is premature to determine whether the proposed structures comply with local land use laws, regardless of the issuance of a contract zone, because the School's plans are not final.[7]

Here, rules of construction indicate that the "local land use laws" referenced in the Easement refer to the laws in effect at the time permission for the additional structure is sought.

---

[7] SVLT seeks to admit extrinsic evidence regarding the intent of the Easement through the affidavit of Mr. Rhames. Mr. Rhames, in turn, asserts that he is familiar with Ms. Merrill's intent through his review of her will. (Rhames Aff. ¶ 5.) While Mr. Rhames draws legal conclusions from reading Ms. Merrill's will, he does not cite to specific provisions in the will supporting his interpretation. (*See id.*) Accordingly, Mr. Rhames' assertions on this matter are inadmissible.

Mr. Rhames also asserts that he is familiar with Ms. Merrill's intent in drafting the Easement through conversations SVLT staff had with Ms. Merrill and because a board member of SVLT was in regular communication with Ms. Merrill's attorney as well as staff at Maine Coast Heritage Trust, the organization that reviewed the draft Easement language. (*Id.* ¶¶ 5-6.) Mr. Rhames, however, has not demonstrated adequate personal knowledge regarding these matters and his assertions are inadmissible hearsay.

Given the difficulties in obtaining local land use laws,[8] and the ongoing nature of the Easement,[9] the court would expect a copy of the local land use laws to be attached to the Easement if the local land use laws were fixed in time at the Easement's execution. To interpret the Easement otherwise would result in the possibility of the SVLT having to determine decades from now whether additional structures were permitted under local land use laws in effect in 1998. *See e.g. Wells v. Powers*, 2005 ME 62, ¶ 3, 873 A.2d 361 (courts interpret deeds to avoid absurd results). Furthermore, although not yet adopted by the Law Court, the court finds merit in the rules of construction that general references to laws include the laws as they are amended over time—unless otherwise expressly provided—and references to specific statutory provisions refer to the law in place at the time of the reference, unless otherwise provided.[10] These rules of construction are consistent with the general reference to local land use laws, without the qualifier "as amended," and the reference to specific statutes "as amended." Accordingly, the court declares that the "local land use laws" referenced in the Easement refer to the local land use laws in effect at the time an additional structure is sought to be added to the Residence/Farm Area.

Lastly, the court denies plaintiffs' request to declare that the School's proposed use has been approved under "local land use laws" because there is no evidence in the record as to whether the "contract zone" approval the School received is the only applicable local land use

---

[8] *See Summit Realty, Inc. v. Gipe*, 315 A.2d 428, 429-30 (Me. 1974) (courts do not take judicial notice of municipal ordinances)

[9] Easement, p. 3, § 1(Easement established in perpetuity).

[10] *See e.g. Conservation Law Found. v. Public Serv. Co.*, 2013 U.S. Dist. LEXIS 176715, *15 (D.N.H. Dec. 17, 2013) ("A general reference statute refers to the law on a subject generally, and adopts the law on the subject at the time the law is invoked, which includes all amendments and modifications subsequent to the reference statute's enactment. A statute of specific reference, as the name suggests, refers specifically to a particular statute by its title or section number, and incorporates provisions as they exist at the time of adoption, without subsequent amendments.") (citations and quotations omitted); *State v. Marek*, 777 P.2d 1253, 1256 (Idaho Ct. App. 1989).

14

law governing the creation of additional structures in the Residence/Farm Area. Additionally, summary judgment is not warranted because the record is unclear as to whether the School intends to add additional structures to the Residence/Farm Area beyond those already proposed.

## III. Conclusion

For the reasons discussed above, the court:

Grants plaintiffs' motion for summary judgment as to Count I because the undisputed facts demonstrate the School's proposed use is not a prohibited "commercial use" within the plain language of the Easement;

Grants in part plaintiffs' motion for summary judgment as to Count II because the parties have not raised any disputed issues of material fact and the rules of deed construction dictate that the "local land use laws" referenced in the Easement refer to the laws as they exist at the time permission for the additional structure is sought; and

Denies in part plaintiffs' motion for summary judgment as to Count II because there is no record evidence as to whether the "contract zone" approval the School received from the City of Saco is the only applicable land use law governing the addition of new structures in the Residence/Farm Area.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: April 29, 2017

John O'Neil, Jr.
Justice, Superior Court

ENTERED ON THE DOCKET ON: 5/1/17

15

RE-2016-44


**ATTORNEY(S) FOR PLAINTIFFS THOMAS W. MERRILL & MARY R. MERRILL:**

SCOTT D. ANDERSON, ESQ.
VERRILL DANA, LLP
PO BOX 586
PORTLAND  ME  04112-0586

KEITH E. GLIDDEN, ESQ.
VERRILL DANA, LLP
ONE BOSTON PLACE, SUITE 1600
BOSTON  MA  02108-4407


**PRO SE PLAINTIFF THE ECOLOGY SCHOOL:**

THE ECOLOGY SCHOOL
C/O DREW DUMSCH
8 MORRIS AVENUE, BUILDING 1
SACO  ME  04072


**ATTORNEY FOR DEFENDANT SACO VALLEY LAND TRUST:**

DURWARD PARKINSON, ESQ.
BERGEN PARKINSON, LLC
62 PORTLAND ROAD, SUITE 25
KENNEBUNK  ME  04043