STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                         Location: Portland
                                        DKT. NO. BCDWB-CV-2019-32

FORREST BRADBURY,                   )
                                    )
    Plaintiff,          )
                                    )
v.                                  )   **ORDER FOR ENTRY OF**
                                    )   **JUDGMENT**
                                    )
WILBOURN CONSTRUCTION, LLC, et      )
al.,                                )
                                    )
    Defendants.         )

The Court held a bench trial in this matter over six days: January 25-29, 2021, and February 11, 2021, on the remaining claim in this matter, Plaintiff's allegations that Defendants are liable for fraud. Plaintiff is represented by Attorney Paul S. Bulger and Defendant Ed Wilbourn is represented by Attorney Sigmund D. Schutz. The Court has reviewed the evidence in this matter, including a number of transcripts that were prepared, as well as the parties' written arguments, the last of which was received by the Court on April 22, 2021.[1] For reasons stated, the Court finds that the Plaintiff has failed to prove his claim of fraud by clear and convincing evidence. Judgment will be entered for Defendants.[2]

## STANDARD OF REVIEW

The parties agree on the elements a party asserting a claim of fraud must prove. Plaintiff Forrest Bradbury must prove each of the following elements by clear and convincing evidence:

---

[1] Although the Court permitted Plaintiff to file a Reply, the Court did not receive one.

[2] Defendants have renewed in writing their Motion for Judgment as a Matter of Law on this claim. While the Court does have the authority to consider this argument at the conclusion of all the evidence, the Court declines to analyze the fraud claim under that standard. The parties expended significant effort in presenting evidence and make oral and written argument; the Court will exercise its discretion to analyze the whole record on the merits.

1) That a party made a false representation;

2) The representation was of a material nature;

3) The representation was made with knowledge of its falsity;

4) The representation was made for the purpose of inducing another party to act in reliance on it; and

5) The other party justifiably relied upon the representation as true and acted upon it to the party's detriment.

*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280.  Plaintiff notes that if there is no affirmative misrepresentation, a party in his position can still establish fraud if there is active concealment of truth by a defendant.  *McGeechan v. Sherwood*, 2000 ME 188, ¶ 61, 760 A.2d 1068.

Clear and convincing evidence requires the party with the burden "to place in the factfinder an abiding conviction that the truth" of the allegations is "highly probable."  *Randall v. Conley*, 2010 ME 68, ¶ 14, 2 A.3d 328.

## FINDINGS AND CONCLUSIONS

Forrest Bradbury and Ed Wilbourn may have at one time been capable of agreeing upon many things, but it is perhaps an understatement to say that is no longer the case.  Over the course of a six-day trial, Mr. Bradbury and Mr. Wilbourn and their witnesses painted very different portraits of their business history, their personal history, and their views of each man's character and credibility.  Both parties describe a long-standing friendship, but it has always been intertwined with a number of business projects over the course of decades, some more successful than others.  The ventures include a number of drilling and construction projects, and a land development project in Virginia, R Income Properties, LLC.  The latter project, a partnership owned by Mr. Bradbury, Mr. Wilbourn and others,  required significant investment in the form of

2

a "infrastructure loan," as Mr. Wilbourn calls it, and the entity Wilbourn Construction, LLC was used in part to make payments for both parties towards that obligation.

The parties have very different personalities and business philosophies. Mr. Bradbury is now 86 years old and has limited formal education, but he has extensive "hands on" experience in construction, especially in drilling, which he has done since approximately 1951. Mr. Bradbury despises paperwork and freely admitted that he often failed to file personal as well as business tax returns. Mr. Wilbourn has more formal education, and sees himself as far more ethical than Mr. Bradbury, but he apparently knew about Mr. Bradbury's penchant for avoiding "paper trails" that could lead to problems with tax authorities; or as Mr. Bradbury put it, paperwork is a "trail to jail." Nevertheless, Mr. Wilbourn agreed to work with him on a number of businesses in a number of states for a number of years. Around the time the parties began discussing formation of the drilling business that is at the heart of this contentious litigation, Mr. Bradbury, according to his wife, had credit that was "shot" and the IRS had levied their personal bank accounts. According to Mr. Wilbourn, he was willing to form the business and work with Mr. Bradbury so long as his home mortgage payments were covered by business income.

While Mr. Bradbury seems to argue that he had been deceived by Mr. Wilbourn in this regard about the amount of the mortgage payments, and how long the payments were to be made, it is clear from the records admitted that these payments were regularly made to Mr. Wilbourn until their relationship fell apart in 2018. Mr. Wilbourn claims that the business they formed is owned 50/50 by both. Initially formed as Northeast Drilling, LLC in August of 2011, approximately 7 months later it became Wilbourn Construction, LLC.[3] Mr. Bradbury held a 1%

---

[3] The articles of formation for this entity were put together by Attorney Rick Winling, a criminal defense attorney who is Mr. Bradbury's neighbor. He testified that these two LLCs were the only LLCs he had ever formed. He was not asked to and did not draft any operating agreement for the entities, nor did he prepare any banking resolutions or voting resolutions for them. His only ongoing involvement was to file

interest himself, while 49% was held by his company Maine Foundation, LLC.  Mr. Wilbourn also held a 1% personal interest, with 49% held by Edpattiw, LLC which is a company he formed with his wife Patti Wilbourn.  While the business records admitted suggest that this was a 50/50 ownership arrangement, Mr. Bradbury's closing argument claims otherwise.  His counsel explains that it was Mr. Bradbury's understanding that while Mr. Wilbourn could use business income to cover his personal mortgage, Mr. Bradbury "did not promise him a partnership.  He did not promise him a payment sufficient to cover his debt service to R Income Properties.  Bradbury viewed the position as a part-time accounting job for a limited period of time sufficient for Mr. Wilbourn to complete the sale of land owned by R Income Properties, LLC, sufficient to get out from the big mortgage."  In addition, Mr. Bradbury claims that someone forged his name on the formation documents.  However, his own expert, Dennis Ryan, contradicted this allegation, as did his attorney in his closing argument.

The parties do seem to agree that with respect to Wilbourn Construction, LLC, Mr. Wilbourn was in charge of the financial and administrative side of the company while Mr. Bradbury worked in the field on the projects.  Mr. Bradbury also was in charge of bidding and supervising the contractors and subcontractors.  The parties lived approximately 1200 miles apart during the events that triggered this litigation, and only met once or twice a month as needed.  Mr. Bradbury conceded that Mr. Wilbourn had authority to borrow money for equipment.

The parties also seem to agree Wilbourn Construction was doing relatively well up until 2018 when their personal relationship – and whatever trust they had left in one another – dissolved into acrimony.  Mr. Wilbourn claims that Mr. Bradbury led him to believe that the company was

annual reports with the State for the parties as their registered agent.  He also testified that Mr. Bradbury instructed him to get information from Mr. Wilbourn for purposes of completing the paperwork.  He is also the registered agent for Maine Foundation, Mr. Bradbury's LLC.

owed a very large debt by Ziegenfuss Drilling, which is owned by a long-time business associate of Mr. Bradbury, Mark Ziegenfuss. In addition, Mr. Bradbury insisted they should continue to loan a very expensive piece of equipment to Mr. Ziegenfuss despite there being no writing to memorialize what if any agreement was in place regarding the terms of its use. Mr. Wilbourn testified that he believed Ziegenfuss was supposed to make periodic rental payments on the equipment, while Mr. Ziegenfuss, who is now himself involved in litigation against Mr. Bradbury, insists he was supposed to be charged only by the linear foot. There is no written instrument in evidence that would enable the Court to know what the agreement actually required. An in-person meeting in New Jersey with the parties and Mr. Ziegenfuss failed to resolve the dispute about the equipment and escalated into a war of words between them in person and in writing.

During the early stages of this litigation, counsel for Mr. Bradbury demanded documents from Mr. Wilbourn which were not, in the view of the Court, timely provided. While Mr. Bradbury insists that this delay bolsters his claims of fraud, the Court would note that the information was eventually provided in time for the parties to reach at least partial agreement on some issues. In addition, contrary to Mr. Bradbury's claims that he never received any tax information from Mr. Wilbourn, he did in fact receive K-1s regularly, and he also received complete business tax returns for a number of years directly from the accountant, Peter Chase, who worked for the company until approximately 2017. In addition, Mr. Bradbury's name is on bank statements admitted, and his wife testified at some length about her own system of paying certain bills and receiving income from customers. The "bible," as she called her handwritten log of deposits, is however of limited usefulness in creating a balanced picture of whether any company income was misappropriated by either party, as it does not show, for example, the payments the company paid directly for the Bradburys' tax obligations and credit card debt, among other things.

5

Mr. Bradbury also claims that Mr. Wilbourn misappropriated a large "credit" with a drill company, Davey Kent. It is not clear to the Court why this credit was so large and why it was carried for so long, but it is clear that Mr. Bradbury had some concern about Davey Kent's ability to pay it in cash and that he was also aware the company had been for sale at some point in time. The credit was due and payable by Davey Kent to Northeast Drilling, Inc. Thomas Myers, President of Davey Kent, testified that he was contacted by Mr. Wilbourn, who ordered equipment including a DK-525 drill. In the course of the equipment transactions, Mr. Wilbourn asked that the remaining credit balance be used to clear the Northeast Drilling account. At some point, after Mr. Wilbourn told him he was not a member of Northeast, Mr. Myers requested that Mr. Wilbourn produce an authorization permitting him to transfer the credit to Wilbourn Construction. Davey Kent received an authorization which, by its terms, permitted the credit to be transferred to the Wilbourn Construction account. Mr. Myers testified that Mr. Bradbury had earlier identified Mr. Wilbourn as his partner at Wilbourn Construction, and that Mr. Bradbury told him to deal with Mr. Wilbourn, despite the long-standing relationship between Mr. Bradbury and Mr. Myers. However, Mr. Bradbury now claims he never gave Mr. Wilbourn this authority, and that the documents had to have been forged by Mr. Wilbourn. Mr. Bradbury's expert did testify that the signature on the authorization did not match Mr. Bradbury's; he was, however, unable to say if the signature was Mr. Wilbourn's. Mr. Wilbourn suggests that if it was not signed by Mr. Bradbury, it was instead signed either by Mrs. Bradbury or by the company bookkeeper, Donna Mayo, who did not testify.

In January 2014, when the drill ordered by Mr. Wilbourn was almost ready, Davey Kent invoiced Wilbourn Construction for $22,956.91, the amount owed after the Northeast Drilling credit was applied. On January 9, 2014, Mr. Myers states in an email that the purchase was

6

intended to clear the accounts "between the various companies." The authorization that was sent to Mr. Myers on February 14, 2014, was the original authorization without a fax "header" while a faxed copy with the header was clearly sent from Mr. Bradbury's fax machine in Maine (for Maine Foundation, LLC) to Mr. Wilbourn in Virginia.

The drill was eventually manufactured delivered by Davey Kent, and it used by Wilbourn Construction. Mr. Wilbourn recorded the credit on the books of Wilbourn Construction as a capital contribution in favor of Maine Foundation, Mr. Bradbury's company.

Both parties have broken down a number of issues and/or events, including those described above, and in their written arguments have analyzed the events under the law of fraud. After considering the parties' categorizations, the Court can identify a number of them that could constitute fraud, if Mr. Bradbury can carry his burden of proving the required elements of fraud by clear and convincing evidence. The Court will address the issues separately.

*Company payments toward the personal expenses of the owners*

As a threshold matter, the Court finds that the parties did agree that the enterprise of Wilbourn Construction was a 50/50 ownership arrangement. Mr. Bradbury's claims to the contrary are not credible given Mr. Winling's testimony and the formation documents, and therefore both parties were entitled to receive distributions. In addition, it is clear both parties benefited from this arrangement, such as it was. Mrs. Bradbury's personal credit card was paid for by business income, along with the Bradbury's personal insurance and federal tax indebtedness. Veterinary services for the Bradbury's farm animals were charged and a Florida vacation were paid for in part by business income. Mr. Bradburn also acknowledged that he approved of Wilbourn Construction paying for both of their personal expenses.

7

The question then becomes whether Mr. Wilbourn fraudulently caused these distributions to be made to Mr. Bradbury's detriment. David Gowen, Mr. Bradbury's own accountant, testified that Mr. Bradbury received half of all distributions from 2014 to 2018 to which he was entitled. If distributions in years prior to 2014 are analyzed (as they were by Jim Beavers, a friend of Mr. Wilbourn, who with Mr. Wilbourn analyzed all distributions made from 2012) it appears likely that Mr. Bradbury received more than half. The Court found the testimony of both Mr. Gowen and Mr. Beavers to be credible.

The Court concludes that in the face of this evidence, no claim for fraud can be made out by the Plaintiff as to business distributions, including the payment of personal expenses of the owners.

*Payment of Mr. Wilbourn's mortgage by Wilbourn Construction*

Mr. Bradbury claims that there was no agreement to pay Mr. Wilbourn's mortgage beyond two years. As with other claims made, there is no writing to clarify what the agreement, if there was one, entailed. There is only the history of payments, and the basically uncontested testimony from both parties that the payments were an important factor which persuaded Mr. Wilbourn to join with Mr. Bradbury in the creation of Wilbourn Construction, LLC. Importantly – as pointed out by Defendants – if there was a "breach" of any particular agreement, that claim could be brought under a theory of contract, but this is a fraud case. There is scant, if any evidence, that Mr. Wilbourn did anything to conceal these payments. Mary Sherman, who worked in the field alongside Mr. Bradbury and other employees and contractors, testified that it was well understood that these payments were being made to Mr. Wilbourn for his mortgage, and the Court found Ms. Sherman to be a credible witness. It was clear that it pained her to describe how the company came apart, and her views on why that happened. She displayed no animus towards Mr. Bradbury

8

and described how she came to conclude that it was primarily his conduct that caused the business to founder.

Mr. Bradbury does seem to conflate the payment of the Mr. Wilbourn's mortgage with his complaints about Mr. Wilbourn making payments toward the Virginia project. The latter payments would arguably benefit both parties. Fundamentally, however, Mr. Bradbury has failed to prove fraudulent intent – either by concealment or misrepresentation – by clear and convincing evidence that the payments of Mr. Wilbourn's mortgage constituted fraud.

### *Unpaid equipment rental*

The Court agrees that Plaintiff is making what appears to be a new claim that Mr. Wilbourn personally owes approximately $119,000 in unpaid lease payments to Maine Foundation. Mr. Bradbury points to payments made in 2013 and 2014 which ceased at the end of 2014. Mr. Bradbury's counsel argues that the "Wilbourn process" of making payments allowed him to make lease payments, or not, "as it suited him. There was no written lease or payment arrangements." The "Wilbourn process," as he calls it, does appear irregular. However, Plaintiff's counsel's statement that "there was no written lease or payment arrangement" undermines any claim of fraudulent intent on Mr. Wilbourn's part. Plaintiff has therefore failed to prove fraudulent intent by clear and convincing evidence.

### *The Davey Kent transaction*

As noted previously, it was never made clear to the Court why such a large credit owed to Maine Foundation was kept on the books of Davey Kent for the length of time it was. However, subsequent transactions and actions taken by both parties undermine Mr. Bradbury's claim that Mr. Wilbourn's conduct constitute fraud.

First, it would be a stretch to find concealment by Mr. Wilbourn of a material fact. Mr. Myers indicated that he preferred to deal with Mr. Bradbury given their long history, but it was Mr. Bradbury who told him to deal with Mr. Wilbourn about the equipment purchases. In addition, it was Mr. Wilbourn who told Mr. Myers that he was not an owner of Maine Foundation, LLC, meaning he could not sign on that entities behalf; in other words, hardly the action of someone trying to pull the wool over the eyes of Mr. Myers.

Perhaps in recognition of these difficult facts, Mr. Bradbury insists that his signature on the authorization was a forgery. As already noted, the handwriting expert, Mr. Ryan, found himself at odds with Mr. Bradbury's claim of another act of forgery, namely Mr. Bradbury's signature on formation documents. But more problematic was Mr. Ryan's inability to say who signed the authorization, if in fact it was not Mr. Bradbury. It seems highly unlikely to the Court that Mr. Wilbourn gained control over the Maine Foundation fax machine to send himself a forged fax. It seems far more likely that Mrs. Bradbury or the Maine foundation bookkeeper both of whom worked regularly at the place where the fax machine was situated, signed Mr. Bradbury's signature at his request.

The forgery argument is also undercut by the fact that the purchase of the valuable money-making drill, made possible by application of this longstanding credit, actually benefited both parties. Again, clear and convincing evidence of fraudulent intent is lacking on this record.

### _Loans from nonowners_

Mr. Bradbury claims Mr. Wilbourn is personally responsible for loans made to Wilbourn Construction, LLC by family and friends of Mr. Wilbourn. First, it should be noted that the loans about which Mr. Bradbury complains were in fact reflected on the company books and were used for company purposes. While Mr. Bradbury casts suspicion on the timing of these loans, noting,

for example, that they were borrowed as company revenues declined, which enabled Mr. Wilbourn to continue to have his mortgage paid by the company. However, having already found that the mortgage payments were authorized, it would be difficult for the Court to conclude that the continuation of these payments during hard times for the company constitute fraud. Such un-reduced payments may have been imprudent assuming, they were paid while the company was foundering, but negligence, even gross negligence, is not the same as fraud. Moreover, Mr. Bradbury also arranged for his daughter to loan money to the company, and the evidence suggests that the loans to the business from sources tied to both parties were treated the same on the company books, and the loans all appear to have benefited the company. Finally, Mr. Beavers credibly testified that Mr. Bradbury not only knew about the loan he made to the company but thanked him for it.

The Plaintiff has failed to prove by clear and convincing evidence that the loans made by friends and family members of Mr. Wilbourn were orchestrated by him with fraudulent intent.

### CONCLUSION

For the reasons stated, Plaintiff has failed to prove by clear and convincing evidence that Defendants committed fraud against him. The entry will be: Judgment will be entered for Defendants, who are awarded their costs. This Order for Entry of Judgment shall be noted on the record pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

7/6/2021

**Dated:** _____

_____
**Hon. M. Michaela Murphy**
**Justice, Maine Superior Court**

11